Rodman *v.* Munson.

———•••———

RODMAN *vs.* MUNSON.

The act of the legislature, passed July 10, 1851, entitled "An act to provide for the completion of the Erie canal enlargement, and the Genesee Valley and Black river canals," is unconstitutional and void; and every debt or obligation contracted or certificate issued under it, on behalf of the state, is also void, and without binding force.

THIS was an appeal by the plaintiffs from a decision made at a special term, on demurrer.    The case at special term is reported ante, page 63, where the facts are fully set forth.(*a*)

*T. H. Rodman,* appellant, in person.

*H. Denio,* for the respondent.

BARCULO, J.    The question is, from its nature, one that must be determined rather by reference to the principles applicable to the interpretation of the constitution, than to adjudi-

(*a*) It is erroneously stated, there, that the decision at the special term was made in *April,* instead of *February,* 1852.

Rodman *v.* Munson.

cations. We are referred, in the argument, to the *ex parte* opinions of several eminent legal men. These opinions, as such, depend for their weight, considerably, upon the motives and considerations which produced them. As we are uninformed as to the inducements, we can only regard them as arguments, and give them credit for the reasons they contain, without reference to the sources from which they emanated.

In considering their reasoning, it is readily perceived that a prominent point of difference between the advocates and opponents of the law arises from the different interpretations given to the term " debt," as applied to a state. Those who contend that the act does not create a debt, seem, in some degree, to confound individual and governmental liabilities ; or at least to disregard, occasionally, the plain distinction between them. Thus Mr. Webster says, in his opinion, " to contract a debt is, in the general sense of the phrase, to incur a liability for the payment of money." (*Senate Documents of* 1851, *No.* 69.) And with this definition he proceeds to demonstrate that the law does not create a debt either " in law or equity." The conclusion follows almost as a matter of course, if the premises are sound, and the term " liability" has the novel signification of an obligation which can be enforced.

But when we speak of state debts, we do not refer to obligations which can be enforced by legal process, either in a court of " law or equity." For in this sense, a state is never indebted. A sovereign cannot be coerced by judgment and execution. All its contracts, however solemnly made, rest solely upon the public faith ; and, when this fails, we hear of repudiation, which unfortunately for the honor of this country, has become too well understood, in some portions of it. While, therefore, we say of an individual, that he is indebted, when he is bound to pay money for an obligation which can be enforced by legal process, we can only predicate this of a state when there is a claim for money which, in justice, the state ought to pay or cause to be paid.

Is it, then, the duty of the state to cause the moneys secured by the certificates, if valid, to be paid to the holders ? In con-

sidering this, we will look at the subject in two aspects.  *First*.
We will suppose that the fund arising from the remainders will
be sufficient for that purpose.  In this case, the certificates will
be paid out of the fund, if the legislature does not divert it to
other uses.  But who creates the fund and causes it to be suffi-
cient?  The state.  The state retains the control of the canals
and administers the revenues by its own voluntary act; for it
cannot be compelled to do so; nor can it be prevented, if the
legislature should so determine, from diminishing the revenues,
so as to render the fund insufficient.  It is a palpable fallacy to
consider these revenues as self-existing—an invariable and never-
failing source from which a sufficiency *must* always flow.  On
the contrary, the very existence of the remainders, as well as
their amount, depends upon legislation, which must be always
liable to variation, as one legislature cannot bind its successors.
The obligation, therefore, reaches beyond that of a mere trustee,
who is to apply a certain fund; it embraces the duty of so ad-
ministering the canals as to produce a sufficient fund, as well as
regulates its application.  This is, in substance, the obligation
assumed by the state whenever it contracts a debt.  When a
state stock is issued, it is under the pledge, that the revenues
shall be so administered that the stock may be redeemed at the
time specified.

*Secondly*.  We will suppose, that the remainders prove to be
insufficient to pay the certificates.  Is not the state then bound
in justice to redeem them out of its other revenues?  I think
there cannot be a doubt either of the duty, or of its performance.
For the act assumes and virtually declares, the sufficiency of
the fund; and if it should prove otherwise, it results from the
miscalculation of the present authorities, or from the misman-
agement of their successors.  In either case the state is bound
in honor and honesty to make good the deficiency from other
sources, and save harmless the holders of the certificates.  The
declaration contained in the 14th section of the act, that the
certificates shall, in no event, be construed to create a debt or
liability within the constitutional inhibition, is much of the same
character as would be the declaration of an obligor at the foot

Rodman *v.* Munson.

of the bond, that he should not be sued in case of non-payment of the money which he obligated himself to pay

If this is not a state debt, what is it? This question has not been fairly answered in any of the learned opinions which have been furnished. Mr. Spencer seems inclined to call it a *sale* of the remainders, although he does not distinctly say so. Judge Bronson supposes it to be valid whether it is called a sale or a mortgage, although he does not call it either. Mr. Webster more cautiously says—"I think the .certificates will amount to a transfer, assignment, or anticipation of certain revenues, and nothing more."

Now, that the transaction cannot be deemed a *sale* of the remainders is perfectly clear, because no title or control of them passes to the holders of certificates, nor does the title to the money paid therefor vest absolutely in the state. On the contrary, the state agrees to repay the money at a specified time, with interest semi-annually.

But if it is a mortgage, or a transfer, or an assigment, it is entirely consistent with being also a debt. For all of these modes of disposing of property may be accompanied by obligations of guarantee which create the relation of debtor and creditor.

The truth, I apprehend, is, that if this act is valid, it has created a state debt and pledged the remainders of the canal revenues for its re-payment. It is a debt in the same sense that the state owes any debt. It is a debt which may lead to taxation. It is a debt, in my judgment, within the precise meaning of that term as used by the framers of the constitution.

The foregoing is a brief outline of the reasoning by which my mind is brought to the conclusion that the act in question is unconstitutional and void.

MORSE, J. Where the constitution has granted powers over a particular subject, it is the natural, as it is the legal inference, that it has granted all the power it intended should be exercised over that subject. It is only the application of a very general rule of interpretation, to say, that when the constitution *expressly* grants *some* power over a subject, it *expressly* grants

*all* the power intended to be conferred over the subject. No aid of a power so granted can be drawn from any implied power arising from the provision in the same instrument of the proper organ for the exercise of the power. The seventh article of the constitution grants certain defined and restricted powers to the legislature over the entire subject of state property, resources and credit. The provision of the legislative organ, so far as this article is concerned, is no more, in effect, than naming the attorney, denoting the organ which is to exercise the power so granted. As to canal revenues, the article grants the power and commands its exercise, of expending, appropriating, setting apart, and applying the whole of these revenues, for specified purposes in each fiscal year. It divides the revenues which it anticipates from the canals, and as to each division, requires its administration in each fiscal year. The act in question contravenes the provision in the third section of the article, as to certain remainders of the canal revenues. It assumes to apply them for a great number of years.

Then, again, the act provides for the creation of a state debt, without complying with the conditions imposed by the twelfth section of the article, and is therefore a violation of that section.

A state debt never contained in its definition any other obligation that the moral one of good faith in calling forth and applying the resources of the state to meet its engagements. In the ordinary sense, as between man and man, there is no legal obligation upon the state which can be enforced against the will of the debtor. A state debt always meant, as it still means, a moral duty on the part of the proper organs of the government to faithfully administer and call forth so much of the resources of the state as may be necessary to comply with its undertakings.

If the state were to receive a loan upon the faith of a direct tax to re-pay the amount loaned, its faith would be pledged faithfully to levy and collect this tax, and that would be its debt. That would be due to the holders of the stock, and would be an instance of a state debt.

The act under consideration authorizes a loan and a pledge

Rodman *v.* Munson.

of certain canal revenues for its reimbursement, with interest. The faith of the state is pledged to repay every cent of this money, which it shall receive, with interest. It will be paid. It will have to be paid. The faith of the state is pledged to manage its canals so as that this money shall be realized from their revenues and paid. It is to be a charge upon the revenues of the state, and the faith of the state is pledged in relation to this part of its resources. It has all the characteristics of a state debt, and I am unable to perceive how any amount of negative words or declarations to the contrary can change its character. It has been said in argument that it was only the sale of certain canal revenues. Where is to be found the power of the legislature to sell the revenues of the state for years to come? They cannot sell the canals, or part with the management of them. That power is expressly denied them. A large object of the management of the canals is to derive a revenue from them. Those revenues, to the last farthing, are the subjects of *granted* power, in this seventh article of the constitution, and it requires a resort to some other power than is to be found in that article, to authorize the supposed sale. But it is no sale. It is a pledge of the faith of the state for the economical administration—management—of these revenues, and to apply the remainder to the payment of the debt of the state as incurred by the loan contemplated in the act.

It has been said, and, for aught I see, truly, that if this act can be sustained, the legislature may authorize a loan of any amount, and charge the salt works and the public lands, or other resources of the state, with its re-payment, and call it a sale, or by any other name than debt, and then insist that it had no more than made the state the trustee of those loaning or furnishing the money; and that in administering the resources from which the re-payment was to come, the state was not acting as a state in the management of state finances, but as a subordinate agent or trustee of those who had furnished the money. How far this would suit the dignity of a sovereign state, or be consistent with the ends for which government is formed, need not here be considered. It is quite sufficient to say, that the

Rodman *v.* Munson.

government of this state has been formed for public and governmental purposes, and that while it can hold the relation which an honest and solvent man holds towards his creditors—that of a moral obligation so to dispose and manage its affairs as to secure the payment of its debts as they shall become due—it cannot be put into the position of a mere trustee, holding its own revenues, not to be applied according to its sovereign will, and in accordance to its inviolable good faith, but as a trustee of alienated domains, and revenues not its own.

Since the judgment in this action, affirming that of Mr. Justice Brown, at special term, was pronounced, his opinion, delivered upon giving judgment, has been published. In that opinion I concur, and will only add that its conclusion seems to me to be drawn, with great clearness and accuracy, from premises which cannot be doubted.

S. B. STRONG, J. This case comes before us on an appeal from a judgment rendered in favor of the defendant at a special term. It has been submitted on written arguments, accompanied by the opinions of several very eminent members of the bar, and we are requested to pronounce a speedy decision. We comply with the request, although it precludes us from giving to the various questions discussed the examination and consideration which their importance would seem to require ; but the public interests call for prompt action on our part, in order that the controversy may be speedily determined by the court of *dernier resort.*

This suit was brought to recover the amount of a promissory note, made by the defendant, and indorsed to the plaintiff after it became payable. The defense is, that the note was given for a canal revenue certificate, issued under the act to provide for the completion of the canals, passed July 10th, 1851 ; that such act is in conflict with our state constitution, and that the certificate was therefore worthless, and did not constitute any consideration to support the note.

The first point raised by the plaintiff's counsel is, that the canal revenue certificates had a marketable value, which was, at

all events, a sufficient consideration for the note. But the fact that a paper would sell in market does not, of itself, render it available as a consideration, as there are many who would willingly purchase counterfeit bills, or notes given for gambling debts, or otherwise *contra bonos mores*, but surely none of these would give vitality to a contract. The rule is, that a consideration is sufficient when it has any legal value, but insufficient where it has none. It is so laid down substantially in the case of *Johnson* v. *Titus*, (2 *Hill*, 606,) quoted by the plaintiff's counsel, and the authorities there cited by the late Judge Cowen. The important question in this cause is, whether the canal revenue certificate was in law valueless, and it certainly was so if the act under which it was issued was unconstitutional.

It is contended by the defendant's counsel that the act in question provides for the creation of a debt by the state, not warranted, but prohibited, by the constitution. The provisions relative to the creation of state debts are contained in sections 10, 11 and 12 of the financial (7th) article of that instrument. The 10th section authorizes the contraction of debts by the state to meet casual deficits or failures in revenue, or to defray expenses not provided for, to an amount not exceeding, singly or in the aggregate, at any time, one million of dollars. The 11th section provides that the state may contract debts to an unlimited amount, to repel invasion, suppress insurrection, or defend the state in war. It is clear that, if the canal act provides for the creation of a debt, it is not warranted by either of these sections, as the sum to be raised, for which certificates are to be issued, far exceeds the amount limited in the 10th, and is not for either of the purposes specified in the 11th. The 12th section declares that, except the debts specified in the 10th and 11th sections, no debt shall be contracted by or in behalf of the state, unless such debt shall be authorized by a law for some single work or object to be specified therein, and such law shall impose and provide for a direct annual tax to pay, and sufficient to pay, the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within eighteen years from the time of the contracting thereof, and that no such law shall take

Rodman v. Munson.

effect until it shall, at a general election, have been submitted to the people, and have received a majority of all the votes cast for and against it at such election. The canal act imposes no tax, nor has it been submitted to the people, and therefore if it provides for the creation of a state debt, it is in direct conflict with the constitution, and wholly inefficient.

Does that act, then, call for the creation of a state debt? The first section declares that the remainder of the revenues of the state canals, after defraying the expenses of collection, superintendence and ordinary repairs, and after paying the several amounts provided by the constitution to be applied to the extinguishment of the canal debt, and the general fund debt, and for the necessary expenses of government, shall be applied in each fiscal year to the completion of the Erie canal enlargement, and of the Genesee Valley and Black River canals, in the manner thereinafter directed, until the said works shall be completed. The second section directs the comptroller of the state to prepare canal revenue certificates for sums not less than fifty dollars each, to be redeemed, and the interest thereon satisfied, as provided in that act. By the 3d and 4th sections it is provided that the surplus revenues mentioned in the 1st section shall be invested in, and constitute, a separate and distinct fund, out of which (and by the 14th section, out of which only) the interest on certificates, and eventually the principal, are to be paid. By the 7th section, the comptroller is directed to sell the certificates to the amount of three millions of dollars within one year, to the same amount within the second year, and to an amount not exceeding that sum within the third year after the passage of the act. By the 8th section it is provided that the avails of all sales of the certificates shall be immediately paid into the *state treasury*, and shall be applied exclusively to the completion of the public works specified in the first section, *three millions during the year next after the passage of the act*, and three millions and five hundred thousand dollars during the following year, and the 11th section directs that the canal board shall, until otherwise directed by act of the legislature, adjust the rates of toll on all articles transported on the canals, in such manner as will, in

Rodman *v.* Munson.

their judgment, produce the greatest amount of trade and revenue. I have thus cited all the provisions of the act which have any essential bearing upon the question under consideration. They are substantially that loans may be made to the state, through the purchase of certificates issued by its principal financial officer, to an amount not exceeding nine millions of dollars; that the moneys thus obtained shall be applied to the completion of the public works *of the state;* and that such moneys, thus obtained and applied, shall be repaid with interest *by the state,* out of certain moneys to arise from *its* said works, so far as such moneys may go, and no further. Now, that all this would constitute a state debt, were it not for the manner and condition of its payment, there cannot be a doubt. Do those terms of payment change, or at all affect its character in that particular? A debt signifies whatever any one owes. (2 *Inst.* 198. 2 *Bl. Com.* 153. *Jac. Law Dict. tit. Debt.*) There is always some obligation that it shall be paid; but the manner in which, or the condition upon which it is to be paid, or the means of coercing payment, do not enter into the definition.

Where one receives another's money to be appropriated to the use of the recipient, it is either a gift or a loan. It is a gift if the money is not to be repaid; but if the understanding is that it is to be returned to the original owner, and especially if with interest, it is a loan, and that constitutes a debt. It is the intention of the parties which gives character to the transaction. Now, in the case under consideration, the purchasers of the canal certificates do not intend to *give* their money to the state. They expect that their money will be returned to them, with interest, by the state, and the legislature designed the same thing, or they would have perpetrated a fraud in passing the act. It is true that the law does not contain any engagement that the money shall be repaid at all events; nor is that necessary to constitute a debt. The implied engagement of a debtor is, that he will pay so far as his means will enable him to do so. But he may qualify his engagement as to the extent of the means to be thus applied, and still owe the money. A judgment creditor has ordinarily a lien upon all the debtor's lands in the county where

the judgment is docketed. Suppose he should release his lien upon a large quantity of the lands thus held, and retain it upon the residue only, would not his demand still be a debt? It is the *original consideration,* and not the extent of the security or liability created, that constitutes the debt. Hence a mortgage given by one to secure the payment of money due from another does not of itself make the mortgagor a debtor. The cases cited by the plaintiff's counsel go to that extent, but no further. The securities of the creditor, and the liabilities and the responsibilities of the debtor, have been much changed in modern times. Formerly the creditor could resort to the person, and all the estate of his debtor, for payment; now the person, except in cases of fraud, is entirely exempt from execution, as is a portion, and sometimes the whole, of the estate of the debtor; and yet what was a debt in the days of Lord Coke is a debt now. I do not intend to say, however, that there can be a debt without *some* responsibility or liability. I admit that one or the other is a universal, if not a necessary concomitant. The rule, however, is not, strictly speaking, applicable to state debts. The state is not legally liable to pay the pecuniary demands at least of its own citizens, as it cannot be sued, nor can any measures be adopted, by them. A state debt, as it is generally understood, is such a pecuniary demand as would, under the attending circumstances, be valid against an individual. The obligation to pay, under such circumstances, is perfect, and cannot be disregarded without a violation of the public faith and that sense of justice which should ever govern the action of states, as well as of individuals. Would, then, the provisions of the act in question, if constitutional, throw upon the state any, and if any what, obligation to pay off the certificates issued under it? Substantially there is an engagement to pay to the extent of the surplus canal revenues, and if they should (as, with good management, they doubtless will) be sufficient to pay all the principal and interest of all the certificates, the engagement, taken in connection with the obligation to which I shall next allude, is in effect absolute. The state is also bound so to manage the canals as to produce the greatest amount of trade and revenue. There is a di-

rect injunction upon the canal board to that effect in the 11th section of the act, which I have already quoted. There is, it is true, a qualification in that section that such management shall be subject to the future action of the legislature, but were the legislature so to act as to diminish the revenue, to the prejudice of those who have advanced their money (as is contended wholly) upon the security which such revenue furnishes, it would be guilty of a palpable breach of faith, which would not be tolerated in an individual, and would be beneath the principles of honor and justice which should ever accompany and govern the acts of states. The canal act would then, if valid, impose upon the state the most important obligations to the purchasers of certificates, and which must necessarily continue until such certificates shall be fully paid, or until the canals shall cease to exist. A violation of such obligations, were they assumed by private individuals, would subject them to an action, in which payment might be coerced out of any part of their estate subject to execution. It appears to me that all these circumstances—the loan of money, the application of it to the use of the state, and the important and possibly lasting obligation upon the state to pay it, nominally conditional, but in effect positive—conclusively indicate that the statute provides for the contraction of a debt by the state.

There are, however, some considerations urged in several of the opinions submitted to us worthy of attention, if not from their intrinsic importance, at least from the high character of those by whom they have been presented.

It is said that the statute does not provide for the contraction of a debt, because it merely calls for an *application* of the surplus canal revenues. The obvious answer to this is, that it may do both : it may, and so it seems to me does, require the application of the revenue to pay the debt. The advance of money is made, and the obligation to pay it is contracted before the revenue is received, and when (as there may be mismanagement) there is no certainty that sufficient revenue to satisfy the demands will ever be received, it surely cannot change the character of a pecuniary demand that it is accompanied by a covenant that some particular means shall be applied to satisfy it; but a con-

clusive answer to this result favorable to the statute from this position is, that such an application of the surplus canal revenue as it calls for would be unconstitutional. The 3d section of the 7th article of the constitution, which I have already quoted, requires that the surplus revenues of the canals " shall, *in each fiscal year*," be applied in such manner as the legislature shall direct, to the completion of the three canals. That is positive that the application shall be *annual*, and in fact prohibits the appropriation in one year of the surplus revenues of several, which the statute purports to make. It has been contended, however, that the word " shall" should be transposed and inserted immediately before the word " be," so that the words " in each fiscal year" may qualify the receipt, and not, as they now do, the appropriation of the money. That words may be transposed to effectuate the intent of those who use them, is undoubtedly true. But to warrant the transposition the intent must appear very clearly and unequivocally. The practice is liable to great abuse, and should be adopted only in extreme cases. Is there any thing in the constitution which calls for, or would justify, the proposed change ?

The words " in each fiscal year," are used six times in the same article, and in each of the other instances they qualify, and were most clearly designed to control, the appropriation.

The rule, which is dictated by common sense, and is universally applied in the law, is, that the same words, used in the same manner and in the same instrument, shall receive the same interpretation.

Now, if we apply that rule, in this case, the word " shall" is in the appropriate place, and should not be transposed. The legislature evidently supposed that the constitution designed what it says, as it uses the same words in the same manner and place in the first section of the act under consideration. But, it is said that where, as in this case, there is a power in the donee to *apply* money in such a manner as he may deem advisable, he has a discretion not subject to any restriction, and that the authority conferred upon the legislature, which I am now considering, is of that character. I grant that a power to *apply*

Rodman *v.* Munson.

money confers upon the donee the right, and devolves upon him the duty, to exercise some discretion in its performance. I thought so when I heard the principle discussed before me, whilst I was sitting in the court of appeals ; and, with great deference to those who decided differently, I think so still. But all human discretion must be subject to some qualifications, and surely that must be the case where they are clearly expressed in the instrument conferring the power. In this instance, it is directed that the application of the money should be annual, and surely it was intended that the discretionary power conferred upon the legislature should be subject to that limitation, and that it should in effect annul it. But it is also said that the convention which adopted the constitution could never have designed to confine the legislature to an annual appropriation, as that would retard the completion of the public works, and thus prejudice the interests of the state.

If, however, there had been an anxiety for the speedy completion of those works sufficiently strong to overrule the old fashioned practice " to pay as you go," which was evidently favored by the convention, the constitution would never have contained its provisions requiring the legislature to set apart in each fiscal year a large portion of the revenues of the canals, ($1,300,000 until 1855, and $1,700,000 after that,) as a sinking fund to pay the existing canal debt. Common sense would have required a direction, first, to apply all the accruing revenues of the canals (after deducting the expenses of their repairs and management) to their completion. There could not have been a design to retain money as a sinking fund to pay an old debt not then due, and at the same time to encounter a new one of a similar character. Upon the whole, it appears to me that there is no good reason for changing the language used in the constitution in this particular, that the power to apply the surplus revenues of the canals is subject to the limitations prescribed in that instrument, and that to decide otherwise would not effectuate, but would counteract the intention of the convention which framed it, and of the people by whom it was adopted.

Again, it is said that the statute provides for a sale of the sur-

plus revenues of the canals, and that, as in all cases of sale, the vendors do not become indebted to the vendees for the purchase money.    But there is nothing in the act authorizing a transfer of the title to the fund, or of any part of it.    The holders of the certificates are authorized to call for the payment of the principals and the interest which may accrue on them, out of such fund, · by the state, but that implies that the title remains in the state. If one agrees to pay money out of a particular fund, it would be absurd to say that he thereby transferred the fund itself, and thus deprived himself of the means of performing his agreement.    Besides, a sale of any part of the revenues of the canals is prohibited by the 6th section of the 7th article of the constitution, which provides that " the legislature shall not *sell, lease,* or *otherwise dispose of,* any of the canals of this state, but they shall remain the property of the state, and under its management forever."    A prohibition of the sale of a fund would be entirely inefficient if it did not extend to its income ; as that, if it could be transferred at all, might be transferred wholly and in perpetuity, and a sale of the income would confer rights upon the vendee utterly inconsistent with the unrestricted power of management designed by the constitution.    Management includes the regulation of tolls, and of course, the right to increase or diminish them.    When an individual sells his income, he has no right to diminish it, and should he attempt to do so, could be effectually restrained.    I have already stated that the moral obligation of a state is co-extensive with the legal liabilities of an individual.    Indeed, this consideration applies to the whole scope of the statute.    It purports to confer rights upon individuals which, if they should be citizens of other states, would, and if citizens of this state, might, prevent the state authorities from so managing the canals as to reduce their revenue, however much the interests of the people might require the reduction.

Another argument in one of the opinions submitted by the plaintiff's counsel is, that the state acts in reference to the pledged surplus revenue of the canals as a trustee for the holders of the certificates, and that a trustee does not become a debtor to the *cestui que trust,* unless he misapplies the trust funds.    It

Rodman *v.* Munson.

is true that one cannot be considered as a debtor where he acts simply as a trustee, and faithfully performs his duty as such, and therefore it is that, as stated in that opinion, the state does not become obligated to the banks for the payment of the securities lodged by such banks in the office of the comptroller. In the case under consideration, however, the purchasers of the certificates advance their money to the state, for the benefit of, and to be used by, the state; and, therefore, if there can be a trust where one holds, and has the management of his own property, the state acts as a trustee to discharge its own obligations. If the transaction would constitute a debt at all, it would not be the less a debt, because the state held a fund in trust to pay it.

Again, it is said, that the constitution was not designed to prohibit the legislature from obtaining money on the credit of its funds, because, it implies the existence of a power to do so as inherent in that body in the absence of any express grant, in the 5th section of the 7th article, which provides that if the sinking funds, or either of them, provided in that article shall prove insufficient to enable the state on *the credit* of *such fund*, to procure the means to satisfy the claims of the creditors of the state as they become payable, the legislature shall by taxes raise the requisite means to preserve the credit of the state. The object of the restrictive provisions in the seventh article was, undoubtedly, to prevent the state from incurring any new indebtedness, not certainly to throw any obstacles in the way of its paying those debts which had then been contracted. The provision last cited has reference simply to the substitution of one debt for another, and, does not therefore, come within the designed prohibition. That might be a reason why the verbal inconsistency (for it is nothing more) between this clause and the provisions in the 10th, 11th and 12th sections of the same article was overlooked. But it can furnish no reason for implying a power to contract new debts to an unlimited extent, and thus in effect to repeal all the prudential provisions of the constitution; for if the state has the general power to contract debts on the credit of its funds, where is there any practical limitation? If the statute could be considered (as is supposed by

the plaintiff's counsel,) as simply providing for an anticipation of the surplus revenues of the canals, I am satisfied, that it would nevertheless be in conflict with the constitution. The injunction contained in the third section of the seventh article which I have before quoted is positive, and I have no doubt was designed to be positive, that such moneys should be in *each fiscal year* applied towards the completion of the canals. But, how can the legislature of 1853 then apply the revenue which shall have been ascertained at the end of the preceding fiscal year, when that and the anticipated revenues of several succeeding years shall have been applied in 1852?

A distinction has been taken between debts which might require a resort to taxation, and such as might be incurred for works which " would certainly and eventually pay for themselves," and it has been said that the constitutional prohibition was not designed to extend to the latter. But history shows that at the time when the constitution was framed, there were numerous applications for the construction of public works, and that the friends of each were sanguine that it would pay for itself, and therefore urged its adoption. Indeed, the most extravagant works in the state, and some of them were very extravagant, had been urgently supported, and had been finally adopted, upon that supposition. The convention had the sagacity to see that the practice of granting away the public money upon the annual productiveness of such works was a dangerous one, and that in fact no human foresight could enable the legislature to determine with certainty that any projected improvement " would certainly and inevitable pay for itself." Indeed, there had been sad mistakes on that subject, for which the state had severely suffered. The convention knew that the legislature had too readily listened to sanguine, loose and interested calculations, and no doubt designed to avert the danger of incurring heavy debts under such pretenses. Probably it was not anticipated that the state would ask for money to be advanced for its public works, with an agreement that it was not to be repaid, if the property should prove unproductive but if the possibility of such a transaction had been suggested, probably the

Rodman *v.* Munson.

prohibition would still have been general, as the convention and the people, while anxious to preserve the credit of the state, would have been equally solicitous to protect it from the dis-honor of repudiation. It might not be exactly repudiation, ac-cording to the peculiar terms of that statute, but it would look very like it, if the state under any pretense, while retaining their public works, should refuse to pay the moneys advanced for their completion.

I consider the principle involved in this controversy as of the last importance. It is whether the constitution shall prevail as the supreme law of the land, according to the plain and man-ifest import of its language, or whether the barrier against legislative extravagance and improvidence which it was de-signed to interpose, shall be prostrated by plausible but unsub-stantial construction.

In conclusion, I am satisfied that the act to provide for the completion of the canals, is in direct conflict with the constitu-tion; and that the certificate issued under it, and for which the note in controversy was given, was void. As my brethren agree with me in these conclusions, the judgment rendered at the special term must be affirmed.

Judgment affirmed.(*b*)

[KINGS GENERAL TERM, April 5, 1852. *Morse, Barculo* and *S. B. Strong,* Justices.]

(*b*) Affirmed by the court of appeals in May, 1852.