## BOSWELL v. STATE et al.

No. 27935.   Dec. 21, 1937.

L. V. Orton, C. E. Mitchell, and Robert Burns, for plaintiff, A. V. Boswell.

Hugh M. Bland, for intervener, Dick Crookham.

C. C. Hatchett, pro se, intervener.

Mac Q. Williamson, Atty. Gen., Randell S. Cobb, Ass't Atty. Gen., John H. Miley, Special Atty., Thos. H. Owen, Allen G. Nichols, Wm. O. Coe, Don Welch, Peyton Ford, and William H. Miley, for defendants.

OSBORN, C. J.   The Sixteenth Oklahoma Legislature enacted Senate Bill No. 205, article 10, chapter 50, Session Laws 1937, which by its terms and provisions authorized the State Highway Commission to issue and sell highway revenue anticipation notes in an amount not to exceed $35,000,-000 to procure funds for "constructing and reconstructing roads and bridges * * * upon the state highway system of the state." Forty per centum of the three cents per gallon excise tax levied by section 2, chap. 126, Session Laws 1933, and conditionally a portion of the motor vehicle registration and license tax revenue, was diverted into a special fund and "irrevocably" pledged to the payment of said notes. The act was not submitted to the people for approval.

Plaintiff, A. V. Boswell, and interveners, Dick Crookham and C. C. Hatchett, have, in this original action, attacked the constitutionality of the act. The defendants are the State Highway Commissioners, State Auditor, and State Treasurer. The prayer of the petition is for an injunction to enjoin the issuance and sale of the notes.

The principal ground of attack is that the act is violative of the provisions of the Constitution which fix the "debt limit" of the state.

Various constitutional provisions are referred to in the briefs, but we will mention only those provisions which we deem to be controlling of the controversy.   Section 23, article 10, of the Constitution provides:

"The state may, to meet casual deficits or failures in revenues, or for expenses not provided for, contract debts; **but such debts, direct and contingent, singly or in the aggregate, shall not, at any time, exceed four hundred thousand dollars,** and the moneys arising from the loans creating such debts shall be applied to the purpose for which they were obtained or to repay the debts so contracted, and to no other purpose whatever."

Section 24, article 10, of the Constitution provides:

"In addition to the above limited power to contract debts, the state may contract debts to repel invasion, suppress insurrection or to defend the state in war; but the moneys arising from the contracting of such debts shall be applied to the purpose for which it was raised, or to repay such debts, and to no other purpose whatsoever."

Section 25, article 10, of the Constitution provides:

"Except the debts specified in sections twenty-three and twenty-four of this article, no debts shall be hereafter contracted by or on behalf of this state, unless such debt shall be authorized by law for some work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax to pay, and sufficient to pay, the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty-five years from the time of the contracting thereof. No such law shall take effect until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election. On the final passage of such bill in either House of the

Legislature, the question shall be taken by yeas and nays, to be duly entered on the journals thereof, and shall be: 'Shall this bill pass, and ought the same to receive the sanction of the people?' "

It is conceded that the control of the fiscal affairs of the state is a legislative function and that the power of the Legislature in the exercise of such control is plenary, subject only to constitutional restrictions and the power of the people to legislate by means of the initiative and referendum. This court is not concerned with the wisdom or expediency of the act. It is our sole function to determine whether or not the act contravenes the provisions of the Constitution.

The question presented to this court is, Does Senate Bill No. 205 authorize the creation of a debt against the state within the meaning of that term as used in the constitutional provisions?

The object of construction, applied to a Constitution, is to give effect to the intent of its framers, and of the people in adopting it. The intent is to be found in the instrument itself; and when the text of a constitutional provision is not ambiguous, the courts, in construing it, are not at liberty to search for its meaning beyond the instrument. Words must be given their ordinary and natural meaning.

Mr. Cooley, in his work on Constitutional Limitations, page 89, says:

"The object of construction, as applied to a written Constitution, is to give effect to the intent of the people in adopting it. * * * In interpreting clauses we must presume that words have been employed in their natural and ordinary meaning. As Marshall, C. J., says: 'The framers of the Constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said.' This is but saying that no forced or unnatural construction is to be put upon their language, and it seems so obvious a truism that one expects to see it universally accepted without question; but the attempt is made so often by interested subtlety and ingenious refinement to induce the courts to force from these instruments a meaning their framers never held that it frequently becomes necessary to redeclare this fundamental maxim. Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government."

If we are to give the words used their natural and ordinary meaning, we refer to Webster's New International Dictionary, where "debt" is defined as:

"That which is due from one person to another, whether money, goods, or services; that which one person is bound to pay to another, or to perform for his benefit; thing owed; obligation; liability."

Therefore, if we give the word "debt" its plain and ordinary meaning, we believe no one can doubt that the act in question authorizes the creation of a state debt. The bill provides for the issuance of notes, and it is common knowledge that a note is the evidence of a debt. As ordinarily understood, it is given for no other purpose. The notes bear interest. They mature at definite dates. They are promises to pay money. These are the attributes of debt.

We must, therefore, inevitably conclude that a "debt," within the prohibition of the above-quoted constitutional provisions, will be incurred under this act unless for some well-defined reason said constitutional provisions are otherwise inapplicable.

It is insisted by defendants that these constitutional provisions apply only to a debt where a direct property tax is levied for its payment, and that they do not apply where the full faith and credit of the state is not pledged, and that in said act it is provided that only a portion of the excise tax on gasoline and certain license taxes are pledged and paid into a special liquidating fund, and therefore the debt limitation provisions of the Constitution are not violated.

By section 12 of the act under consideration, it is provided that, in order to obtain funds to pay the principal and interest of the notes issued under authority of said act, 40 per centum of the three cents of the gasoline excise tax referred to in section 2, chapter 126, Session Laws 1933, shall be apportioned and credited to a special fund in the office of the State Treasurer, to be known as "State Highway Commission Note Fund of 1937", and that the principal and interest of said notes shall be payable solely from said fund and from the revenue deposited therein as therein provided, and said portion of said excise tax on gasoline is irrevocably pledged to the payment of the principal and interest of said notes. Conditionally, a portion of the motor vehicle registration and license tax revenue was pledged. Other provisions not deemed material to a determination of the question involved herein are contained in said section. By section 4 of the act under consideration, it is expressly provided that "such Highway Revenue Anticipation Notes

are not and shall never become a general obligation of the State of Oklahoma, but shall be payable solely out of the revenues and. funds herein provided and pledged." And by section 5 of said act it is provided that:

"Said notes and coupons attached thereto sh'all show upon their face that they are issued by the State Highway Commission and that they are not debts or general obligations of the State of Oklahoma, but are payable solely out of a special fund created for the purpose and from the revenues pledged thereto."

Although the bill recites that the notes "are not debts or general obligations of the State of Oklahoma," this is in no respect conclusive of the matter. The question of whether the bill authorizes a debt of the state contrary to the constitutional pro- visions is a judicial and not a legislative question. Newell v. People, 7 N. Y. 9; State v. Candland (Utah) 104 P. 285; Wilder v. Murphy (N. D.) 218 N. W. 156; 59 C. J. 223. n. 35. See, also, Campbell v. State, 23 Okla. 109, 99 P. 778.

Article 10 of the Constitution deals with the subject of Revenue and Taxation in so far as the state, its subdivisions, and its municipalities are concerned. In determin- ing the intent of the framers of the Con- stitution and of the people in adopting it, we must consider every section in the ar- ticle, in relation to every other section con- tained therein, in so far as they are appli- cable to the issue. A study of the various provisions of the article discloses that the framers of the Constitution intended to deal fully with the levy and expenditure of both general ad valorem property taxes and spe- cific taxes. The first 10 sections of the ar- ticle refer generally to ad v'alorem taxes, while section 12 provides:

"The Legislature shall have power to pro- vide for the levy and collection of license, franchise, gross revenue, excise, income, col- lateral and direct inheritance, legacy, and succession taxes; also graduated income taxes, gr'aduated collateral and direct in- heritance taxes, graduated legacy and suc- cession taxes; also stamp, registration, pro- duction or other specific taxes."

Both general property taxes and specific taxes are referred to in these sections, and no distinction is m'ade between them in sec- tions 23 and 25. article 10, supra, which pro- hibits incurring of debts against the state. These sections do not provide that a debt payable in a certain manner may not exceed $400,000, but that no debt shall exceed that sum. No distinction is made between the

two forms of taxation in so far as limiting the amount of indebtedness which may be incurred by the state is concerned.

The debt limitation provisions of the Con- stitution are a vital part of that document. The purpose of the people to reserve to themselves control over the creation of debts is shown not only by the provisions of sec- tion 25, but also by the provisions of sec- tion 26, of article 10, which deals with mu- nicipal debts. Section 9, article 10, of the Constitution, as enacted, authorized a levy of ad valorem taxes for state purposes not to exceed 3½ mills, but an amendment to said section ·was adopted by the people of this state on August 15, 1933 (State Ques- tion No. 185, Referendum Petition No. 61), which provided that:

"No ad valorem tax sh'all be levied for state purposes, nor shall any part of the proceeds of any ad valorem tax levy upon any kind of property in this state be used for state purposes."

While the Constitution must be in- terpreted in the light of its meaning at the time of its adoption by the people, the state is now wholly dependent upon funds derived from levies of specific taxes for the opera- tion of the affairs of government. To sus- tain the position of the defendants in this case, that the "debt limit" provisions of the Constitution have application only to gen- eral ad valorem property taxation would be to hold that there is no constitutional debt limit in this state. Such a conclusion would thus nullify the provisions of sections 23 and 25, article 10, of the Constitution.

The revenues which are "irrevocably pledged" for the payment of the notes are authorized by section 12, article 10, of the Constitution, and are a part of the general revenues of the state, which revenues may be devoted to any public purpose designated by the Legislature. In fact, the gasoline tax, since first levied in 1923, has been used not only for state and county highway pur- poses, but also a portion has been used for relief of the destitute (article 10, ch. 66, Session Laws 1931), and to pay outstanding state warrants issued for general govern- me'ntal purposes (section 2, ch. 126, S. L. 1933). At first a portion of the motor registration tax was placed in the general revenue fund (section 11, art. 4, ch. 173, Session Laws 1915). The money raised by the issuance of the notes is to be used for the maintenance and construction of state property, that is to say, highways. The ownership is in the state by virtue of the sovereignty which it exercises over every

part of its domain. No other legal entity exists which can claim ownership. In common parlance, it is entirely immaterial whether one or another part of the state revenue is drawn upon so long as that revenue could be available for any public purpose which the Legislature may designate.

It is clear that in this state the word "revenues," as used in the Constitution, does not mean simply those arising from ad valorem taxation. Kirk v. School District, 108 Okla. 81, 234 P. 596. So when it is provided in section 23, article 10, that debts may be created to meet casual deficits in revenues, it must have been understood that the same revenues could be pledged to the payment of the debt as those whose failures caused the deficit. These revenues include all taxes that may be levied for general purposes. There is nothing in this section that limits the debts as a charge against property. Nor is there such a limitation in section 24. In Milburn v. Childers, 178 Okla. 84, 61 P. (2d) 1047, this court, in effect, held that the tax provided for by section 4 of article 10 of the Constitution for the purpose of paying the state debt did not necessarily require an ad valorem or property tax.

The tax levy of an excise tax on gasoline is authorized by the provisions of section 12, article 10, supra, together with the levy of other specific taxes. If the Legislature had the power to authorize the creation of a debt for a purpose deemed to be beneficent, and to provide for the pledging of revenues derivable from the gasoline tax to the payment of such an obligation, then future Legislatures, for other purposes which they deem to be beneficent, may authorize the creation of indebtedness and irrevocably pledge the revenues to be derived from other specific taxes to the payment of said obligations, which might result in impoverishing the general revenue fund of the state to the extent that the orderly functions of government could not be carried on, or, in the alternative, in onerous and burdensome levies of other specific taxes in sums sufficient to meet the ever-expanding expenses of state government.

In the case of State v. State Highway Commission (Mont.) 296 P. 1033, at page 1035, the court said:

"The fact that a special fund is created by the imposition of the license or excise tax on motor fuels with which to pay the debentures is of no importance.

"Under this contention the Legislature, or the debt contracting authority, could divide the public revenue into numerous subdivisions, calling one the 'road fund,' another the 'school fund,' another the 'agricultural fund,' another the 'public health fund,' and others almost without limit. Debts could then be contracted in unlimited amounts and payable in the far distant future, and still be immune from attack 'as violating constitutional provisions limiting indebtedness, provided each debt was made payable out of some one of the specially designated funds into which all of the revenue collected by taxation from the people had been divided. A mere statement of the proposition carries with it, it seems to us, its own refutation. Crick v. Rash, 190 Ky. 820, 229 S. W. 63.

"The fund raised from the motor fuels excise tax results from one of the constitutional methods of raising the public revenues. * * * They are state funds, and the state has the right to devote the proceeds of this tax to any public purpose it sees fit."

But, it is said those are "chambers of horrors" out of place here, because we must assume that the Legislature will not abuse the power and that such statements as are made in the Montana case do not rise to the dignity of argument. The question, however, is not "Will the Legislature abuse the power and create all such special funds?" but "Did the people intend to give the power which might be so abused?" It is difficult to reach the conclusion that the people so intended, if they were attempting to guard against abuses of the past. We may not contemplate that future legislative assemblies will become reckless, extravagant, or improvident in dealing with the revenues of the state, but it is our solemn duty to determine the intent of the framers of the Constitution and of the people in adopting it with respect to the authority of the Legislature to incur debts which the people must pay. What we have said clearly demonstrates that the interpretation and construction sought to be placed upon these constitutional provisions by the defendants could not have been contemplated by the framers of that document, but that the people intended that the government should be operated on a cash, or pay-as-you-go, plan. It is significant to note that in the adoption of the Constitution the people reserved to themselves all power to determine whether or not debts should be incurred, excepting only those debts which might be incurred under the specific provisions of sections 23 and 24, article 10, of the Constitution, and also fixed upon themselves the responsibility for providing the revenue for the payment of such debts. We cannot approve the contention of defendants that the limita-

tions contained in said constitutional provisions relate only to ad valorem taxes on property and have no 'application to specific taxes.

The contentions here made, that the state is not liable because this is a pledge of special funds only, that it has declared in the act and notes that it does not create a debt or liability against the state, and that the state will not pay the revenues arising from these excise taxes into its public treasury but will be merely a trustee, are by no means new. They arose in New York 85 years ago and under constitutional provisions so nearly identical with those under consideration that the discussion thereon must be of persuasive force here. The constitutional provisions under consideration therein are identical with our constitutional provisons above quoted except as to one word which is clearly and patently immaterial. Certain canal certificates were under consideration therein which had been made payable only from a special fund—canal revenues. There also the Legislature attempted to provide that the certificates should in no event be construed to create a debt or liability against the state. The Legislature provided that the state should in no event be liable to make up any deficiency in the canal revenues nor to redeem the certificates from any other source than the canal revenues. The court said that this provision did not relieve the contract from being a debt. Speaking on this point, in the case of Rodman v. Munson (N. Y.) 13 Barb. 63, affirmed 13 Barb. 188, and further affirmed 13 Barb. 205, note, that court said:

"To constitute a debt there must be a contract, either express or implied, but it is not indispensable that the liability created by the contract should extend so far as to subject the person of the debtor or all of his property to be seized. * * * A debt payable only out of the proceeds of a trust estate is none the less a debt because there is no personal obligation resting upon any one for its payment further than the obligation of executing the trust with fidelity, and no source from whence it can be paid but the trust property. If these positions be sound, then it must necessarily follow that **money advanced to a state at its own request, and applied to its own use, upon a written contract that it is to be repaid, with the interest, from the proceeds of the sales of its public domain, or from the proceeds of any other specific branch of its revenue, and from no other source whatever, must create a debt within the legal as well as the universal sense of the term."**

See Newell v. People, 7 N. Y. 9.

A problem identical with that presented here was before the Supreme Court of Colorado in the case of In re Senate Resolution No. 2, 31 P. (2d) 325. In that case there was involved the constitutionality of a legislative act which provided for the issuance and sale to the United States Government of highway debentures for the purpose of providing funds for the construction, repair, and improvement of highways. The act was styled an "Emergency Relief Measure to Provide Employment Quickly and to Defend the State." A portion of the state excise tax on gasoline was pledged to the payment of said debentures as they became due. The Constitution of Colorado provided that the Legislature should not "contract any debt by loan in any form" (art. 11, sec 3). It was pointed out that the court had previously approved the "special fund" doctrine, but that it was not applicable, since the Constitution prohibited the pledging of revenues of future years, which funds would be otherwise available for general purposes. It was held that the 'act was unconstitutional. Following the promulgation of this opinion, the people of Colorado amended the Constitution to provide that "the proceeds from the imposition of any license, registration fee or other charge with respect to the operation of any motor vehicle upon any public highway in this state and the proceeds from the imposition of any excise tax on gasoline or other liquid motor fuel shall, except costs of administration, be used exclusively for the construction, maintenance, and supervision of the public highways of this state" (art. 10, sec. 18, as added in 1934). Thereafter, in the case of Johnson v. McDonald (Colo.) 49 P. (2d) 1017, the court sustained the constitutionality of an act which provided that the state might borrow money from the Federal Government to the extent of $25,000,000 by issuing anticipation revenue warrants against the highway fund and further providing for payment of such anticipation revenue warrants out of revenues subsequently accruing to the highway fund. The court was cautious to point out that the subsequent arrangement did not create a debt against the state within the meaning of the constitutional inhibition, because the funds pledged to pay the debt **would not be available for general purposes.**

When applied to the fiscal setup of our own state, the logic of these opinions is unanswerable. The revenues derivable from an excise tax on gasoline are not, and may not be construed to be, "special funds" within the meaning of that term as employed by the authorities dealing with the "special

fund doctrine" hereinafter noticed. These funds have been used in the past to defray a portion of the expenses of general government and to liquidate indebtedness incurred as general governmental expense. Defendants have not been able to point to any constitutional or statutory inhibition against so using said funds in the future.

The effect of the act with which we are dealing is to pledge irrevocably the funds arising from gasoline taxes to the payment of the revenue anticipation notes, and thus to lay a mortgage upon a source of revenue of the state. The act is for the creation of an indebtedness in excess of $400,000. The power to create it is circumscribed by the limitations of the Constitution, which prohibits the creation of an indebtedness in excess of said amount (section 23, art. 10, supra), except to repel invasion, suppress insurrection, or to defend the state in war (section 24, art. 10, supra), unless such debt is authorized by a vote of the people and a direct annual tax is provided and so authorized by the people sufficient to pay the principal debt and interest thereon (section 25, art. 10, supra).

Section 1, article 5, of the Constitution vests the legislative authority of this state in the Legislature, but by virtue of the same section the people reserved to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also power at their own option to approve or reject at the polls any act of the Legislature. To sustain the validity of the act involved herein would be · to hold that the Legislature is empowered to enact irrevocable and unrepealable legislation, thereby not only depriving a future legislative body of its right to repeal the law levying the tax pledged to the payment of the outstanding notes, but likewise denying the people of this state the right to repeal the levy of the tax or to provide for the distribution of the revenues arising therefrom to another or different purpose. As we conceive it, the constitutional provisions dealing with the "debt limit" of the state were adopted for the purpose of fixing the power and responsibility of legislation relating to the fiscal affairs of the state upon the existing legislative assembly, and to prevent one legislative assembly from laying its mandate upon a future one. The effect of these provisions is that one legislative assembly cannot guarantee the span of life of its legislation relating to the fiscal affairs of the state beyond the period of its biennium. These provisions of the Constitution guarantee that the power of a subsequent legislative body either to acquiesce or repeal shall always be existent.

The defendant contends that, in any event, the bill ought to be sustained upon the "special fund doctrine," as now invoked in this and other jurisdictions. That doctrine is simply an exception to the debt limitation provisions and is based on the theory that the obligation, payable out of a special fund, is not a debt against the state. The most common application of the special fund doctrine is in the group of cases dealing with obligations payable out of the income from municipally owned utilities. There are apparently two views with respect to the application of the doctrine in these cases. The first, or the one sometimes called the "restricted" special fund doctrine, is limited to cases where the thing creating the obligation is self-liquidating, and where no charge is made against a pre-existing fund owned by the city and available for general purposes. Garrett v. Swanton (Cal.) 13 P. (2d) 725, and authorities therein cited. The other view, or the "expanded" special fund doctrine, is applied to obligations created by an extension and improvement of a utility, payable out of the net income of the whole plant, even though it may have been first created with proceeds from general tax levies and the income therefrom is already being used for general governmental purposes. State v. City of Miami (Fla.) 152 So. 6, and cases therein cited.

As applied to states, the special fund doctrine is invoked in a group of cases involving toll bridges where the debt contracted to build the bridge is payable solely out of the tolls collected therefrom. These are instances of the self-liquidating or "restricted" special fund theory. Attorney General v. State Bridge Comm., 277 Mich. 373; Estes v. State Highway Commission (Ky.) 29 S. W. (2d) 583; Bates v. State Bridge Commission (W. Va.) 153 S. E. 305.

Another instance of the application of the self-liquidating special fund doctrine, as applied to states, is the dormitory cases. The doctrine is there invoked where the bonds are payable solely from the rent of the dormitory which was constructed with the proceeds of the bonds. McClain v. Regents of University of Oregon (Ore.) 265 P. 412; State v. Davis (N. D.) 229 N. W. 105. The special fund doctrine was sustained in Fanning v. University of Minnesota (Minn.) 236 N. W. 217, where the bonds were payable not only from the net earnings of the dormitory, but partly from other revenue of the university, which was not owned by the state other than as trustee, and could

be used for none other than university purposes. It must be noted that this is analogous to the public building bond cases hereinafter discussed. But in Wilder v. Murphy (N. D.) 218 N. W. 156, the doctrine was rejected, where the act providing for the erection of dormitories pledged the income from three other dormitories which had already been completed at the expense of the state. Thus, the "expanded" special fund doctrine applied in some municipally owned utility cases is rejected in the dormitory cases.

The "special fund doctrine" is also invoked in another group of cases dealing with acts providing for the erection of public buildings with the revenue from lands granted for a specific purpose. The doctrine has a different application in these cases. The charge against the special fund is held not to be a debt because the state never had an unqualified ownership in the fund. It did not "belong to the state in the ordinary sense," but the state merely held it in trust. Therefore, no property of the state, in the real sense, was involved. State v. Clausen (Wash.) 235 P. 364; State v. Regents of University (N. M.) 258 P. 571. This theory is further reflected by the contrary holding in the cases where part of the state's generally owned property would be charged. State v. McMillan (N. D.) 96 N. W. 310; State ex rel. University of Utah v. Candland (Utah) 104 P. 285. Thus the doctrine in these cases is limited to obligations held in trust. Johnson v. McDonald (Colo.) 4 P. (2d) 1017.

There are other cases dealing with miscellaneous subjects, but based upon the theory that the project is self-liquidating, and no other fund is charged. In re Opinion of the Judges (S. D.) 162 N. W. 536; Casch v. Miller (Ohio) 135 N. E. 813; Clarke v. S. C. P. S. Authority, 177 S. C. 427, 181 S. E. 481.

Defendants, to sustain the validity of the act under consideration, rely principally upon cases from Washington, Oregon, South Carolina, New Mexico, Alabama, California, and Kansas, which we shall briefly analyze.

In Washington (Ajax v. Gregory, 32 P. [2d] 560) it was held no indebtedness of the state was created by the sale of bonds payable out of a liquor revolving fund, consisting of license fees, permit fees, penalties, and other money received under the State Liquor Act. The funds were acquired by the bonds for the purpose of putting into operation the Liquor Act, until it could become a going concern. In stating the rule which was there applied, the court merely quoted from State v. Clausen, supra, a typical public building bond case, based upon the qualified ownership in the state, and regarded the cases as indistinguishable.

Similarly, in Oregon (Moses v. Meier, 35 P. [2d] 981), the court held that the constitutional debt limitation was not violated by the issuance of certificates to be paid solely from anticipated revenues derived from the manufacture and sale of liquor. The money so raised was to be used for the relief of unemployment. It is important to notice that the court there relied on the self-liquidation theory, and regarded the dormitory bond case of McClain v. Regents of University, supra, announcing the "restricted" theory, as indistinguishable.

In South Carolina (Briggs v. Greenville County, 135 S. E. 153), the court did no more than announce the doctrine as analyzed above. It was there held that no state indebtedness was created by certain "reimbursement agreements," which were in effect bonds issued to build roads payable out of a fund created by the automobile license tax, federal aid moneys, and three-fifths of the gasoline tax. The court relied on cases from the utility group and a special assessment group, and construed these funds as analogous to "special assessments upon property benefited by the improvement." The court went further in the case of State v. Moorer (S. C.) 150 S. E. 269, in sustaining the validity of an act which pledged, in addition to the proceeds of the gasoline tax and motor vehicle tax, "the full faith, credit, and taxing power" of the state. The court proceeded on the premise that the word "debt," in the ordinary sense of the term, was not the same as it is in the constitutional sense, which conclusion is not consistent with the view we have taken herein.

When we read the acts upheld in the cases from California and Alabama (California Toll Bridge Auth. v. Kelly, 21 P. [2d] 425; and Alabama State Bridge Corp. v. Smith, 116 So. 695), we notice that the courts had merely to consider orthodox toll bridge legislation. In California, the addition of certain appropriations to the tolls, for payment of the bonds, was contended to create a charge on state property. The court held that only the tolls were pledged and the appropriations were "a separate and distinct transaction, entirely aside the mark in considering the legality of the bonds in this case. * * *" In Alabama, the portion of the act regarding the application of the gasoline tax and other revenues, in addition to tolls, to the payment of the bonds was construed not to

constitute a **pledge** of those funds, 'but only an authority so to do, if the Governor, in the exercise of executive discretion, approves such course of action." See concurring opinion by Justice Bricken. Thus the only thing pledged in both cases was the toll.

The cases from New Mexico and Kansas are based primarily, not upon the special fund doctrine, but upon the interpretation which those states have seen fit to give their Constitutions. In State v. Connelly (N. M.) 46 P. (2d) 1097, 100 A. L. R. 878, the court sustained the validity of bonds issued to erect a Supreme Court building, payable out of a fund created by the imposition of a fee on all cases filed in the district courts of the state. It was held that the debt limitation provision of the Constitution was designed to apply only to debts contemplating the levy of a general property tax for their retirement. In State ex rel. Boynton v. Kansas State Highway Comm. (Kan.) 28 P. (2d) 770, the court sustained the validity of warrants issued for the construction and maintenance of highways payable from special taxes on motor vehicles and motor fuels. By constitutional amendment as construed, it was specifically provided that the debt limitation provisions should not apply and the special taxes in question could be used for no other purpose.

It is said that the "special fund doctrine" has been recognized and applied by this court in the case of Baker v. Carter, 165 Okla. 116, 25 P. (2d) 747, and so it has. It is urged that the recognition of said doctrine in that case constitutes a precedent for the validity of the act under consideration herein. In that case, however, a public corporation, the Agricultural and Mechanical College of this state, was authorized to issue certain certificates of indebtedness for the purpose of constructing a dormitory, **the sole provision for payment** being the revenues produced from the rental of the conveniences of said dormitory. The revenues which were to create the special fund had no existence prior to the issuance of the obligations; they were to arise wholly out of the property created by the use of the proceeds of the bonds authorized. The fund created was in no sense derived from a tax of any kind. No property of the state already producing income was to be utilized in any way to help create the special fund. The public revenues of the state were not concerned. The contemplated asset was to be a self-liquidating project. Therein the court quoted from the California case of Garrett v. Swanton, 13 P. (2d) 725:

"* * * An indebtedness or liability is incurred when by the terms of the transaction a municipality is obligated directly or indirectly to feed the special fund from general or other revenues in addition to those arising solely from the specific improvement contemplated. It also seems to be well settled, as a second limitation to the doctrine, that a municipality incurs an indebtedness or liability when by the terms of the transaction the municipality may suffer a loss if the special fund is insufficient to pay the obligation incurred. * * *

"The 'special fund' doctrine was never intended to be applied to a situation where the municipality, directly or indirectly, is or may be compelled to feed the special fund from other revenues in addition to those arising from the special improvement contemplated. Such a subterfuge, if sanctioned, would go far to eventually wipe out the purpose and intent of the constitutional provision."

But in the case at bar the so-called fund is created from specific taxes which constitute a part of the state's general revenue. The levy of taxes therefor had already been made and a similar fund had been in existence for many years. The fund is created out of tax money which can otherwise be devoted by the Legislature to any legitimate public use. The maker of the obligation here is not a separate legal entity, but is merely an arm or agency of the state. The roads heretofore built from the proceeds of various ad valorem taxes, gasoline taxes, and county bond issues will be used by those purchasing gasoline the same as the roads to be constructed from the indebtedness sought to be authorized herein. It is manifest, therefore, that the project contemplated by this act of the Legislature is in no sense a self-liquidating project.

The "special fund doctrine" was specifically rejected by this court in the case of Zachary v. City of Wagoner, 146 Okla. 268, 292 P. 345, which was distinguished by this court in Baker v. Carter, supra. Therein the city had purchased certain Diesel engines as a unit in a municipally owned lighting system to be paid for out of the "savings" from the operation of said system. While the federal court, in the case of Fairbanks-Morse & Co. v. City of Wagoner (C. C. A.) 81 Fed. (2d) 209, thought this court had misperceived the distinction, we are impressed that, the case coming to us upon a demurrer to the petition, the allegations of which were taken as true, the distinction pointed out was real. We have not departed from the principles therein enunciated. See Layne-Western Co. v. City of Depew, 177 Okla. 338, 59 P. (2d) 269.

We are referred to the case of Edwards v. Childers, 102 Okla. 158, 228 P. 472. In that

case it was sought to enjoin the payment of certain obligations of the state out of the state highway maintenance and construction fund. An attack was leveled against certain sections of chapter 101, S. L. 1923-24, which levied a tax of two and one-half cents per gallon on gasoline and provided that 60 per cent. thereof be placed in a special fund designated as "the State Highway Construction and Maintenance Fund," to be expended by the State Highway Commission in the maintenance and construction of state highways, on the ground that said sections did not lawfully appropriate said funds to a specific purpose. It was held that the creation of a special fund by a continuing specific tax, the whole of which was designated to a specific purpose, constituted an appropriation within the meaning of the provisions of section 55, article 5, of the Constitution of this state. There is not the remotest relationship between the issue presented therein and the issue involved in the instant case. The term "special fund," as used in that case, relates to a particular fund created by the levy of a specific tax for a specific purpose, as distinguished from the "general revenue fund" of the state created for the payment of the general expenses of state government.

The distinction between the term "special fund," as used in Edwards v. Childers, supra, and the "special fund doctrine," as defined and applied in Baker v. Carter, supra, is readily discerned. In the latter the fund therein was to consist wholly of revenues derived from the contemplated project, which revenues were pledged to the payment of the cost of constructing the project. As heretofore pointed out, it was a self-liquidating project, and such a project is not involved in either the instant case or in the case of Edwards v. Childers, supra. The fund herein could be termed a "special fund", as the term is used in Edwards v. Childers, supra, without doing violence to our conclusion that the two cases are not analogous.

A careful study of the various authorities cited by defendants discloses that in some jurisdictions the failure to observe the distinction between a particular fund derived from a specific tax levied for a specific purpose, which has been termed a "special fund," and a fund partaking of the nature of a trust fund derivable from a self-liquidating project under the "special fund doctrine," has led to a confused interpretation and to an unwarranted extension of the "special fund doctrine," which we refuse to follow.

Defendants have referred to other decisions of this court which they contend are applicable by analogy. It is urged that the cases of In re State Funding Bonds of 1935, Series A, 173 Okla. 622, 50 P. (2d) 221, and In re State Funding Bonds of 1935, Series B, 173 Okla. 626, 50 P. (2d) 226, support their contention. In those cases the court approved the issuance of funding bonds to liquidate an existing state debt evidenced by outstanding warrants. It was specifically pointed out that bonds which were issued to fund a valid indebtedness neither create nor increase the debt of the state, but merely change the form of existing indebtedness. These cases are not analogous to the situation presented here.

We are likewise referred to certain decisions relating to the public building fund bonds issued pursuant to the provisions of section 2, chapter 89, Session Laws 1910-11. See In re Assessment First National Bank of Chickasha, 58 Okla. 508, 160 P. 489; State ex rel. Freeling v. Howard, 67 Okla. 296, 171 P. 41. The funds pledged to the payment of the bonds were moneys received from the sale and rental of certain lands granted to the state by the United States for charitable and penal institutions and public buildings and constituted trust funds and not general revenue funds of the state.

Our attention is also directed to the case of Security Bank & Trust Co. v. Barnett, 169 Okla. 298, 36 P. (2d) 874, which involved the liquidation of the depositors' guaranty fund, wherein it was held that holders of depositors' guaranty fund warrants issued pursuant to legislative authority for procuring funds to replenish the depositors guaranty fund were entitled to full payment thereof, since the Legislature had provided that said warrants should constitute a first and prior lien against said fund. In that case the power of the state to become indebted in excess of the amount provided in the Constitution was not involved. Moreover, the fund was raised, not under the taxing power of the state, but under the police power. Noble State Bank v. Haskell, 22 Okla. 48, 97 P. 590.

When we analyze the authorities on which defendants rely to sustain the validity of the act under consideration, we find ourselves unable to give our constitutional provisions limiting the right to incur debts the construction given to the Constitutions of the states herein referred to as construed by their courts. As heretofore pointed out, it is our opinion that the framers of the Constitution of this state intended to limit the amount of indebtedness incurred against the state without the approval of the electors thereof

in the manner designated by section 25 of article 10, whether that indebtedness be payable by a general ad valorem property tax or by funds derived from a specific tax which would otherwise be available for general revenue purposes of the state.

By section 17 of the act, the Legislature declares that the provisions of the act are severable. This declaration will be given force when possible, but since the main features of the act depend on the creation of the special fund, it is apparent that all of those parts of the bill dependent upon the creation of such special fund must fail as being ineffective without such unconstitutional features. See Parwal Inv. Co. v. State, 71 Okla. 121, 175 P. 514; Williams v. Standard Oil Co., 278 U. S. 235, 73 L. Ed. 287. In this connection, however, it may be said that, although the appropriation provided by section 15 is challenged, it is not shown that any payment thereunder has been threatened in such a manner as to challenge our consideration thereof. It may be that the Legislature expected to pay special counsel for services rendered whether the main features of the bill were or were not defeated. This question, in view of the record, will be reserved for a proper case.

Having taken the view hereinabove set out, that the indebtedness sought to be created by said act is contrary to the Constitution of this state, it is unnecessary to discuss the other questions raised by plaintiffs. For the reasons herein stated, we hold Senate Bill No. 205, in so far as it purports to authorize the issuance of highway revenue anticipation notes, is unconstitutional and invalid, and that an appropriate writ should issue.

Honorable Denver N. Davison, a Justice of this court from the Eighth District, having certified his disqualification in this case, Honorable Thomas P. Holt was appointed as Special Justice by the Governor to sit in his stead.

BAYLESS, V. C. J., and CORN, GIBSON, and HURST, JJ., concur. PHELPS, J., concurs in part and dissents in part. RILEY and WELCH, JJ., and HOLT, Special Justice, dissent.

PHELPS, J. (concurring in part and dissenting in part). I heartily concur in that part of the majority opinion wherein it says:

"It is conceded that the control of the fiscal affairs of the state is a legislative function and that the power of the Legislature in the exercise of such control is plenary, subject only to constitutional restrictions and the power of the people to legislate by means of the initiative and referendum. This court is not concerned with the wisdom or expediency of the act. It is our sole function to determine whether or not the act contravenes the provisions of the Constitution."

In addition I desire to emphasize the time-honored and well-known principle of law that a legislative act should never be nullified by judicial decision except where it plainly and unmistakably violates the provisions of the Constitution. In other words, when the legislative branch of the state government has enacted a law and the executive branch has approved it, then the judicial branch is justified in nullifying or voiding it **only** when it plainly violates some provision of the Constitution.

When the constitutionality of an act is questioned it is the solemn duty of the court to lay the act alongside the Constitution and with the instrument, alone, as the yardstick conscientiously and fearlessly decide the question according to the applicable rules of law, irrespective of popular clamor, indifferent to public criticism and oblivious to political consequences.

With these principles in mind and guided by a wealth of adjudicated cases on the subject. I would find no difficulty in concurring in the principles of law announced in the majority opinion in so far as they conform to what was heretofore said in Zachary v. City of Wagoner, 146 Okla. 268, 292 P. 345, if I did not feel bound by the contrary rule subsequently announced by this court in Baker v. Carter, 165 Okla. 116, 25 P. (2d) 747, but I cannot concur in the reasons given, the argument used, the attempted distinction between the two cases nor the attempted distinction between Baker v. Carter and the instant case.

I think that the rule announced in Baker v. Carter is contrary to, and in effect overrules, Zachary v. City of Wagoner, notwithstanding the attempted distinction; and I think the majority opinion, in the instant case, likewise, in effect, overrules Baker v. Carter, notwithstanding the attempted distinction.

A proper explanation of the foregoing statements necessitates an examination of the facts and circumstances surrounding the litigation in these cases.

The city of Wagoner made a contract and purchased certain Diesel engines with which to operate its municipally owned light plant, agreeing to pay for them from the savings in cost of operation. A taxpaying citizen brought suit in which he attacked the validity of the contract as

violative of the Constitution. This court upheld his contention (Zachary v. City of Wagoner, supra), and in the third paragraph of the syllabus said:

"The fact that an indebtedness incurred by a municipality is to be paid only from some source other than ad valorem taxation does not render inoperative the limitation contained in section 26, article 10, of the Constitution, or extend the grant of authority contained in section 27, article 10, of the Constitution."

In the body of the opinion this language is used:

"We are not unmindful of the rule followed in some jurisdictions that **the purchase of property does not create an indebtedness if the purchase price is to be paid out of the income therefrom** (Winston v. City of Spokane, 12 Wash. 524, 41 P. 888; Faulkner v. City of Seattle, 19 Wash. 320, 53 P. 365; Joliet v. Alexander, 194 Ill. 457, 62 N. E. 861; East Moline v. Pope, 224 Ill. 386, 79 N. E. 587, and other cases), **but we cannot follow such holding.** In our opinion, this is but another attempt to nullify and evade the wholesome constitutional limitations upon the power of the municipalities to create indebtedness and to usurp powers never intended to be granted to municipal officers. * * * Sections 26 and 27, article 10, supra, contain nothing that limits their application to indebtedness to be paid from funds derived from ad valorem tax levy. **They are general in their terms and they will be applied by this court to all manner of indebtedness, no matter how created or from what source the indebtedness is to be paid.**

"* * * That section is placed in our Constitution for a distinct purpose. This court will not destroy the effect of that section by saying that municipal officers may evade its force by purchasing equipment for a public utility to be paid for out of the saving to the municipality from the use of the equipment so purchased."

This opinion cites, quotes from. and discusses former opinions of this court, to wit: Byrum v. City of Shawnee, 63 Okla. 16, 200 P. 183; City of Sapulpa v. Land, 101 Okla. 22, 223 P. 640; In re Bliss, 142 Okla. 1, 285 P. 73.

I, then a practicing lawyer, was one of the attorneys for the city of Wagoner. This court refused to follow our contention. but I could not in good conscience criticise the opinion, for it appeared to be based upon sound logic, good reasons, and salutary constitutional provisions. I. in common with other members of the legal profession, as well as the courts, assumed that Oklahoma had taken its place among that group of states which refused to follow the special fund doctrine and thought the law on that subject was definitely settled.

Eight members of the court concurred in the opinion, the ninth being absent. The depression came on. The 13th Legislature was in session. The Agricultural and Mechanical College needed additional dormitory facilities to accommodate the great number of students who were clamoring for the educational advantages to be obtained at that institution. The federal government, with a generous hand, was assisting the states and the various units and municipalities thereof in their relief burdens by providing labor for the unemployed and markets for building materials by encouraging people to build needed and worthwhile buildings and make necessary additions, repairs, and improvements. Responding to the emergency and desiring to take advantage of the federal government's generous assistance, the Legislature authorized the issuance and sale of Oklahoma Agricultural and Mechanical College dormitory bonds in the sum of $450,000 to provide necessary accommodations for the students. The only provision made for the payment of interest and principal of these bonds was to pledge the income and revenue from the dormitories for that purpose. Mr. Baker, a taxpaying citizen, attacked the validity of the bonds upon substantially the same grounds as Mr. Zachary attacked the contract of the city of Wagoner for the purchase of Diesel engines (Zachary v. City of Wagoner, supra). When the case reached this court the entire personnel (with one exception) had changed since the opinion in the Zachary Case had been promulgated. In upholding the validity of the bonds an opinion covering 13 pages in the Oklahoma Reports was written in which practically all the special fund doctrine cases were cited with approval, discussed, and analyzed, finally concluding as follows:

"An examination of many authorities cited in the brief and a research of many others conducts us to the conclusion that, so far as the special fund doctrine is concerned, the majority rule as set forth in the case of Garrett v. Swanton et al., supra [Cal. 13 P. (2d) 725], announces the correct rule that a limitation upon state or municipal indebtedness is not violated by an obligation which is payable out of a special fund, if the state or municipality is not liable to pay the same out of its general fund should the special fund prove to be insufficient. * *. *" [Baker v. Carter, 165 Okla. 116, 128, 25 P. (2d) 747, 758.]

Thus in Zachary v. City of Wagoner, supra, we rejected the special fund doctrine when we said:

"We are not unmindful of the rule followed in some jurisdictions that the purchase of property does not create 'an indebtedness if the purchase price is to be paid out of the income therefrom (citing cases) **but we cannot follow such holding.**"

And in Baker v. Carter we adopted the special fund doctrine when we said that:

"* * * The majority rule as set forth in the case of Garrett v. Swanton et al., supra, announces the correct rule that **a limitation upon state or municipal indebtedness is not violated by an obligation which is payable out of a special fund. * * *"**

In the light of our later expression, above, the legal profession, the courts, and the Legislature were justified in the conclusion that we had receded from our announced rule in Zachary v. City of Wagoner and had adopted the special fund doctrine recognized by, at least numerically, the greater weight of authority, including our sister states of Washington, Oregon, South Carolina, New Mexico, Alabama, California, and Kansas.

The 15th Legislature, no doubt guided by what we had previously said in Baker v. Carter, authorized the issuance of bonds in the aggregate sum of $1,850,000 to build dormitories at nine different state institutions, providing for the retirement of the bonds in substantially the same manner as the 13th Legislature had provided for the retirement of the bonds of the Agricultural & Mechanical College Case. So far as I am advised, no question was ever raised as to the validity of these bonds.

Then came the 16th Legislature. The depression was still upon us. Thousands of our citizens were out of employment and our relief burdens were reaching staggering proportions. The federal government was still assisting with a generous hand. The legislators were again confronted with the task of meeting the emergency. They doubtless read our opinion in Baker v. Carter, supra, and observed that we had relaxed the rule laid down in Zachary v. City of Wagoner and had adopted the more liberal and more generally followed "special fund doctrine" and concluded that the relief burden could more easily and quickly be met and the assistance and co-operation of the federal government more readily obtained by building and maintaining needed roads and highways throughout the state with no additional tax burden, and enacted the legislation now under consideration, and in doing so spe-

cifically provided that the bonds to be issued should never be a debt of the state, and that they should so show upon their face. In this they apparently attempted to make doubly sure that the act came within the rule laid down in Baker v. Carter, supra.

The constitutionality of the act was attacked by a taxpaying citizen in much the same way the attack was made in the cases of Zachary v. City of Wagoner and Baker v. Carter, and it is doubtful if there has ever been a case before this court of more importance in its far-reaching effects, or in which there has been a greater public interest, and the members of the court have industriously 'and conscientiously devoted themselves to a study, research, and discussion of the questions presented. The task has not been easy. Some of the questions presented are decided with little, if any, precedent. Changed conditions and necessitous circumstances of the past few years have caused some jurisdictions to relax, to some extent, the hard and fast rule of interpretation heretofore valuable as precedents. As human beings, justices and judges cannot be oblivious, or even indifferent, to the probability that the dire distress of thousands of our citizens had something to do with the enactment of this and similar legislation, as a part of the relief program of the state in which the federal government would participate, and thereby furnish work for our great army of unemployed to build and maintain the contemplated highway system. And, too, I have felt that it is not entirely inappropriate to consider empty stomachs and naked backs as well as the cold and unsympathetic principles of law, **so long as we may do so without doing violence to fundamental rules of law.** We have not all agreed, hence the dissenting opinions.

I cannot follow the reasoning of the majority opinion (in its efforts to now uphold the Dormitory Bonds Case and at the same time reannounce the rule in the City of Wagoner Case) wherein the majority opinion says:

"The fund created was in no sense derived from a tax of any kind * * * the public revenues of the state were not concerned"

—remembering that in the City of Wagoner Case we said that the provisions of the Constitution "will be applied by this court to all manner of indebtedness, no matter how created or from what source the indebtedness is to be paid."

Stress is apparently laid upon the fact that the A. & M. College is a public corporation of the state, but, as I see it, that fact

is of no consequence, because the A. & M. College is as completely an arm, branch, or agency of the state as is the Highway Commission. In Oklahoma Agricultural & Mechanical College v. Willis, 6 Okla. 593, 52 P. 921, the Territorial Supreme Court held that that institution, while a public corporation, was an arm of the territory, could not be sued without specific authority, and that the obligations of that institution were the obligations of the territory, and its creditors must look to the territory for payment of their claims.

In the recent case of State v. Miser, 72 P. (2d) 408, in disposing of a question similar to the one under consideration here, the Supreme Court of Arizona said:

"The fact that the university is incorporated does not make it any the less an arm, branch, or agency of the state."

It is my belief that the public revenues of the state were concerned. As I view it, the rentals from these dormitories constitute a part of the revenues of the state as fully and completely as do royalties from oil wells, in which the state has an interest, the rentals from the cigar stand or cafeteria in the Capitol; they are all public revenues—just as the gasoline tax—and are subject to distribution or allocation by the Legislature. I think it may correctly be said that any income to the state, from any of its arms, branches, or agencies, whether it be from toll bridges, dormitories, gasoline tax, or otherwise, is public revenue.

In Moses v. Meier, 148 Ore. 185, 35 P. (2d) 981, the court was considering a question similar to the one before us. It too was confronted with its own prior decision wherein bonds for building a university dormitory had been upheld. The act in question in the dormitory case had not even constituted the university a "separate entity," as was the situation in our own dormitory case. It followed its dormitory case decision and said:

"In this state there is the closely analogous case of McClain v. Regents of University, 124 Ore. 629, 265 P. 412. The act involved therein authorized the regents of the university, acting as an agency of the state, to sell bonds for the purpose of constructing a dormitory and provided that the principal and interest of the bonds should be paid solely from the net income from the rentals of the building. This court upheld the constitutionality of the act, since there was no liability against the state and the bondholder was obliged to look exclusively to the special fund consisting of the net rentals and income from the building. We

see no substantial difference between that case and the one at bar."

Neither can I follow the majority opinion in its discussion and application of the "restricted special fund doctrine" and the "expanded special fund doctrine," and attempts to make distinctions not heretofore undertaken by this court in any authorities to which my attention has been called. In one part of the opinion it is stated that:

"The special fund doctrine was specifically rejected by this court in the case of Zachary v. City of Wagoner"

—and in another part of the opinion it is stated that:

"It is said that the special fund doctrine has been recognized and applied by this court in the case of Baker v. Carter, and so it has."

We either have the special fund doctrine or we don't have it. The people of this state, and especially the legal profession, the judges, and the Legislature, have a right to some dependable rule of law. In the Zachary Case, as I interpret it, we say in substance that we will have nothing to do with the special fund doctrine. In the Baker Case, as I interpret it, we embrace it wholeheartedly, attempting a distinction between that and the former decision, and in the instant majority opinion we attempt to recognize them both.

I am not greatly concerned as to which rule we follow, but I am deeply concerned as to the clarity, stability, and permanency of our decisions. Recently an eminent jurist was credited with the statement, in reference to the interpretation of the Constitution of the United States, that "The Constitution is what the Judges say it is." If there is any reason for saying that the Oklahoma Constitution is "what the Judges say it is," then we should not say it is one thing today and another thing tomorrow. The public, the legal profession, the courts, the Legislature, and all citizens have a right to assume that when the Supreme Court of the state of Oklahoma announces a certain rule of law, particularly as applied to a public policy of the state, it will continue to be the law, and that the business of the state may accordingly be shaped, formed, and transacted assuming that the law will not be changed by any judicial pronouncement; subject always, of course, to the right and duty to overrule or modify a decision when it is found to be clearly erroneous, but when this is done it should be done by plain, clear, and unequivocal language.

Holding to this view, I am not willing to

448

follow the majority opinion wherein it joins that group of states which reject the special fund doctrine and announces that because thereof the Constitution has been violated, as in the case of Zachary v. City of Wagoner; and then about-faces, and joins that group of states which recognize the special fund doctrine and say that because of such recognition the Constitution has not been violated, as in Baker v. Carter; and then, as in the majority opinion, attempts to recognize both rules.

We should either go down one road or the other, and if we are to follow the former rule, we should frankly say so and overrule the case of Baker v. Carter. If we are to follow the latter rule, then we should say so and definitely abandon the position taken in Zachary v. City of Wagoner.

RILEY, J. (dissenting). The issue deemed by the majority vital, in this original action testing the constitutionality of the act of the 16th Legislature, article 10, ch. 50, p. 367, S. L. 1936-37, providing for "highway revenue anticipation notes" payable only from revenue derived from an excise tax on gasoline and conditionally for a portion of motor vehicle and registration fees, is whether a debt against the state would be incurred by the issue as inhibited by provisions of sections 23, 24, and 25, art. 10, Constitution. All other questions are deemed favorable to validity of the legislation.

Section 24, Id., is in no wise concerned. It has to do with debts to repel invasion, suppress insurrection, or to defend the state in war, and the amount allowable is unlimited.

Section 23, Id., limits state debts for **casual deficits, failure in revenues,** and **expenses not provided** for to the sum of $400,-000.

Herein there is provision for the expense. There is no failure in revenues concerned, and casual deficit means, in its component parts, "that which happened by accident, or is brought about by an unknown cause" (Lewis v. Lofley, 19 S. E. 57, 92 Ga. 804; Civil Code La. 1900, art. 2023; In re Appropriation by General Assembly, 13 Colo. 316, 22 P. 464); and "a want in tax or revenue" (Mutual Loan & Bldg. Ass'n v. Price, 19 Fla. 127; In re Village of Plattsburg, 50 N. Y. S. 356, 27 App. Div. 333).

The only other constitutional limitation upon state indebtedness is that found in section 25, Id., and therein are found limitations as to proceedings essential to the contracting of such debts by or on behalf of the state. It reads:

"Except the debts specified in sections twenty-three and twenty-four of this article, no debts shall be hereafter contracted by or on behalf of this state, unless such debt shall be authorized by law for some work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax to pay, and sufficient to pay the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty-five years from the time of the contracting thereof. No such law shall take effect until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election. On the final passage of such bill in either House of the Legislature, the question shall be taken by yeas and nays, to be duly entered on the journals thereof, and shall be: 'Shall this bill pass, and ought the same to receive the sanction of the people'."

It may truly be said that the purpose of this proposed debt is "some work or object."

There is no provision within the act for a direct annual tax to pay interest when due and principal within 25 years if, as elsewhere construed (hereinafter cited and quoted), these words require an ad valorem tax for such purposes. Consequently a vote of the people upon the act, whether favorable or unfavorable, would not in itself determine, correspondingly, validity or unconstitutionality of the legislation.

Returning to the vital question, we may divide it into two parts. (1) Does the act provide for a debt by or on behalf of the state, or is it such a debt as has been by this and other courts relegated to a special fund? (2) If a state debt, is it such a debt as contemplated by section 25, supra? Unless both of these questions are determined as against the act, the legislation must be sustained.

No one disputes but that a debt would be created by issuance and utterance of the notes, but that such debt is not that of the state is the specific declaration of the Legislature by the text of the act. It is provided that such notes shall never become a general obligation of the state of Oklahoma, but shall be payable solely out of the revenues provided and pledged. This, the notes must show upon their face.

The revenues and funds from which the notes are to be paid are "forty (40%) of the three (.03) cents of the gasoline excise tax derived from each gallon of gasoline, referred to in section 2, of chapter 126, S. L. 1923, which is to be apportioned and credited to a special fund, out of which both principal and interest shall be paid,

with a further provision that if at any time it appears to the State Treasurer and State Auditor that sufficient money will not accumulate in said fund from that source of revenue to pay the principal and interest of said notes, then said officers shall cause one-half of the State Highway Commission's share of any registration or license taxes on motor vehicles to be placed in said special fund for such purposes."

Determination of the vital question is dependent upon whether this court will continue to indulge the "special fund doctrine," and whether that doctrine is applicable to the case at bar.

As long ago as the decision in Campbell v. State ex rel. Brett, 23 Okla. 109, 99 P. 778, this court repudiated the special fund doctrine as applied to counties. In that case Washita county sought ownership of a courthouse under a plan whereby it would pay ten annual rentals aggregating $139,-252.67. The rental payments were agreed to be reasonable and just. The so-called self-liquidating project was deemed to be a debt inhibited by the Constitution in that it covered "a period of years," and such "is never valid, except when approved by a vote of the electors. * * *" But there the project was not a truly self-liquidating project. The rentals provided for were to be paid out of a fund raised by taxes levied upon the whole taxable property of the county. It was said:

"In times of popular clamor and excitement the internal improvement craze often well-nigh wrecks the most flourishing counties and towns, even in staid and conservative commonwealths. Excuses for withholding the application of these restraints, wisely devised, however, should not be made to delay expenditures unless we find a substantial reason therefor in the organic law of our commonwealth.".

The court then adopted this language:

"A debt is money due upon a contract, without reference to the question of the remedy for its collection." Mayor & City Council of Baltimore v. Gill, 31 Md. 375.

In State v. McMillian, 96 N. W. 310, North Dakota, from whence came our constitutional provision cited in Bryan v. Menefee, 21 Okla. 1, 95 P. 471, declared as an inhibited debt, bonds in the sum of $60,000, sought to be issued for purposes of a normal school wherein liquidation was to come from the sale, rental, and lease of school lands. They denied the doctrine to state agencies. Dakota had followed New York, Newell v. People, 7 N. Y. 9, wherein it was held:

"It makes no difference whether the debt is contracted on the general credit of the state or on the credit of a fund belonging to the state. When the interest on a loan is raised by a tax it comes from the pockets of the people individually; when it is paid out of a fund belonging to the people it is paid out of their common purse."

And:

"The extent of the obligation does not affect or qualify its nature. So long as there is an obligation assumed by the state, it constitutes a debt; something due from the state."

New York, as recited by the majority (Rodman v. Munson, 13 Barb. 63, 13 Barb. 188), denounced as inhibited debts "a debt payable only out of * * * a trust estate" irrespective of personal obligation or limited liability therefor, under the reasoning that a state, as applied to its agencies and property in trust to it, or one of them, owed an "obligation" of "executing the trust with fidelity."

Such was the holding in Wilder v. Murphy (N. D.) 218 N. W. 156, and In re Application of State to Issue Bonds, 33 Okla. 797, 127 P. 1065, construing article 10, supra. This court held:

"These limitations were intended to prevent the contracting of that class of pecuniary obligations not to be satisfied out of current yearly funds, or other funds in hand lawfully applicable thereto."

See, also, Graham v. Childers, 114 Okla. 38, 241 P. 178.

Therefore, and to and including the date of the decision in Zachary v. City of Wagoner, 146 Okla. 268, 292 P. 345, it conclusively appeared that in event, as in the case at bar, excise taxes were pledged to the payment of interest and principal of an obligation extending over a period of years, a debt was in existence.

In the City of Wagoner Case, the city contracted to purchase Diesel engines and to pay for them over a period of from 52 to 120 months from savings expected in cost of operation. This court, with my vote, repudiated again the special fund doctrine. We said:

"We are not unmindful of the rule followed in some jurisdictions that the purchase of property does not create an indebtedness if the purchase price is to be paid out of income therefrom (citing cases), but we cannot follow such holding. * * * Under the decisions of this court and the Constitution and laws of Oklahoma, the agreement to pay for the material purchased creates an indebtedness no matter from what source the funds are to be derived from which the payment is to be made.

Sections 26 and 27, art. 10, supra, contain nothing that limits their application to indebtedness to be paid from funds derived from ad valorem tax levy. They are general in their terms 'and they will be applied by this court to all manner of indebtedness, no matter how created or from what source the indebtedness is to be paid. As well might a municipality contend that an indebtedness was not an indebtedness because it was to be paid from receipts from gross production tax or other sources of income other than 'ad' valorem taxation. We cannot give our approval to any such theory of the law." Layne-Western Co. v. City of Depew, 177 Okla. 338, 59 P. (2d) 269.

The transaction involved in the City of Wagoner Case in a different form came before the United States Circuit Court of Appeals for the Tenth Circuit, in Fairbanks-Morse Co. v. City of Wagoner, 81 Fed. (2d) 209. Therein the special fund doctrine 'as applied to municipalities of Oklahoma was upheld, in that a contract for the purchase of equipment for municipally owned utility to be paid for solely out of saving in cost of production of electricity, including operation, maintenance, upkeep of plant, equipment of building, so as to include a deduction for "depreciation," did not increase the tax burden.

But see modification of the rule obtaining in the federal court as applied to the special fund doctrine as stated upon rehearing. Fairbanks-Morse Company v. City of Wagoner, 86 Fed. (2d) 288, under which it was held the city was unauthorized to enter into a special fund contract, but that the city was required to make restitution of the property obtained and compensate the seller for depreciation thereon, or to pay the balance due therefor.

It may here be stated that the decisions involving the special fund doctrine fall into three classes or groups: The first repudiates the doctrine entirely under the view that to permit the borrowing of money under a special contractual device for its payment, even though there is express provision against general liability for repayment and express provisions that the lender shall look only to restricted assets or income as security, in effect annuls and violates constitutional restrictions and limitations of indebtedness and are consequently void. In re Senate Resolution, 94 Colo. 101, 31 P. (2d) 325; State ex. rel. Diederich v. State Highway Com., 89 Mont. 205, 296 P. 1033; Crick v. Rash, 190 Ky. 820, 229 S. W. 63; Newell v. People, 7 N. Y. 9.

The second class limits the doctrine to obligations which do not undertake to pledge existing revenue of any plant, or other existing revenue producing asset, but limit payment to revenue produced from the plant or other project purchased or constructed from the proceeds of the notes, bonds, or debentures; that is, in these cases payment of the debt is limited to proceeds of self-liquidating projects provided. See annotation 72 A. L. R. 688.

Lastly, there is the class of decisions which affirms the rule that obligations, not payable from ad valorem or other direct annual taxes, but are made payable solely from excise taxes or other special and independent revenue, do not constitute a debt of the state within prohibition of a constitutional or statutory debt limit. Board of Regents v. Sullivan (Ariz. 1935) 42 P. (2d) 619; Alabama St. Bridge Corp. v. Smith, 217 Ala. 311, 116 So. 695; Conner v. Blackwood St. Highway Com'r, 176 Ark. 139, 2 S. W. (2d) 44; California Toll Bridge Authority v. Kelly, 218 Cal. 7, 21 P. (2d) 425; Bates v. St. Bridge Commission, 109 W. Va. 186, 153 S. E. 305; Estes v. State Highway Comm., 235 Ky. 86, 29 S. W. (2d) 583; Tranter v. Allegheny Co. Authority, 316 Pa. 65, 173 Atl. 289; Brazos River Conservation and Reclamation Dist. v. McGraw, 126 Tex. 506, 91 S. W. (2d) 665; and annotations in 72 A. L. R. 687, and 100 A. L. R. 900.

It appears that this court, after wholly repudiating the special fund doctrine, as applied to counties, cities, and other political subdivisions, in the cause of Baker v. Carter, 165 Okla. 116, 25 P. (2d) 747, by a divided vote, indulged the theory as applied to bonds in the amount of $450,000, authorized to be issued by the State Board of Agriculture, the proceeds to be used to construct dormitories at the A. & M. College 'at Stillwater. Legislative authorization for the liquidation of principal and interest on the bonds from rentals was sustained. Fairbanks-Morse Co. v. City of Wagoner, Okla., 81 Fed. (2d) 209.

State and county treasurers were allowed to invest governmental sinking funds in the paper, and there was no provision that the principal and interest of the instruments was to be paid exclusively from the funds pledged to liquidation of the obligation. There the state authorized the issuance of the obligation just as in the case at bar. There the evidence of obligation was granted for money borrowed by the state and the money procured from the loan was for a state purpose, and one theretofore usually provided by an appropriation. The funds pledged to payment of the loan might

well have gone into the state treasury, as indeed failure in such revenues pledged, in which sinking funds had been invested, constituted a deficit which could only be liquidated in the customary manner by taxation both excise and ad valorem.

It is said in the briefs of plaintiff and intervener that the Baker Case is a typical case for the application of the special fund doctrine, and so it is. The force of the opinion on the matter publici juris is sought to be avoided and circumvented by the statement that the A. & M. College is a public corporation and a separate legal entity, whereas the State Highway Commission is neither.

That the college is a quasi-public corporation is beyond dispute, but it is not a legal entity in every sense of the word. The status of the corporation and property belonging to it, in relation to the state of Oklahoma, is substantially the same now as it was before statehood in the relation it bore to the territory.

In Oklahoma A. & M. College v. Willis, 6 Okla. 593, 52 P. 921, the Territorial Supreme Court, in referring to the status of the A. & M. College, said: "That the defendant is a public corporation, * * * there can be no doubt." But it is not a legal entity in every sense of the word. It cannot be sued in the absence of express statutory authority. A. & M. College v. Willis, supra. "The obligations of the defendant (the A. & M. College) in the case at bar, are the obligations of the territory, * * * and to the territory its creditors must look for payment where there is no fund appropriated for the payment of their claims."

But it is futile to waste time to argue that public educational institutions are any less a part of the sovereignty than is a State Highway Department. It is readily apparent that where the state is one of the contracting parties, and where the department of state or the quasi-public corporation is a part of the state, the obligations of the instrumentalities of government are the obligations of the state. So being, the question recurs, whether the obligation is such a debt as is contemplated by section 25, art. 10, Constitution, and in determining this question, this court has resolved the question in the negative by consideration of the limited manner of payment of the obligation. Solemnly the court recorded its approval of the A. & M. College Dormitory bond issue by deciding in effect that the obligations were the obligations of the special fund pledged toward liquidation and not the general obligation or debt of the state. The Legislature acted upon such advice of a co-ordinate branch of government, and various and sundry obligations of like character have been issued under legislative authorization as a consequence of the judicial determination. The executive department of government in approval of subsequent legislation has been in accord with the court's decision.

Over my vigorous protest and dissenting opinion, this decision definitely placed this court's stamp of approval on the special fund doctrine as applied to projects undertaken by the state or on the state's behalf, as depicted by the subsequent legislative record. The court, having placed its hand to the plow, cannot now with good grace turn back. This court, as I view it, cannot afford, in matters publici juris, to exercise on one occasion an approval such as that given by a Chief Magistrate or Governor, and on a subsequent occasion, as applied to resulting legislation involving the same subject-matter, exercise a judicial veto.

The reasoning upholding the theory in one of its stages is apparently that, since only net revenue produced and to be produced by the project purchased with or constructed from the proceeds of the notes or bonds sold are to be applied to their payment (in case of failure of such revenue, payment likewise fails), it is assumed that without the project there would be no such revenue. And since no other sources of revenue may be tapped to supply funds, no indebtedness intended to be inhibited by the Constitution is incurred. That is to say, those who pay direct or ad valorem taxes are no worse off by having the utility or public work, and the state, or municipality, as a whole, may benefit. Thus it is reasoned no harm is done and some good may be accomplished, and by setting up a "special fund" as payment; and no debt is incurred except by the "Special Paymaster."

In the cited case this court, following the decision in Graham v. Childers, 114 Okla. 38, 241 P. 178, limited the meaning of "state debt" as prohibited by section 23, art. 10, Constitution, to a condition whereby the Legislature, under section 4, art. 10, Constitution, is required to provide for liquidation by levying a tax. And this court cited with approval the rule stated in 59 C. J. 225, sec. 370, to the effect that:

"Obligations issued by a state, if payable only from revenues to be realized from a particular * * * property, acquired with

the proceeds of the obligation, if payable only from the revenue to be realized from special taxes for a particular * * * property, or if payable only from a special fund to be raised from the sale or lease of lands previously set apart for the purpose of the obligations, do not generally constitute debts of the state within the meaning of the constitutional limitations on indebtedness."

In the cited case the meaning of "state debt" was narrowed in accordance with the construction in South Dakota, 38 S. D. 635, 162 N. W. 536, so as to indulge legislation providing for the "borrowing of money on the good faith and credit of the state" and authorizing the issuance of bonds where repayment was to be made **"out of some fund then within the immediate control of the corporation."**

It is to be noted that the highway construction fund is now largely within the control of the State Highway Department; that the present tax on gasoline and license tax are devoted to the purposes of that fund; that the present act continues that object in view and particularly pledges that fund for the purposes of liquidation of the obligation herein considered. The act of the Legislature is just as effective and binding, so long as it stands, as would be a constitutional provision by amendment as experienced in the state of Kansas and elsewhere specifically pledging such revenues and thus eliminating them as a source from which the general expense of state government may be defrayed. Indeed, under the contract clause of state and federal government, it may be seriously questioned whether, when such revenues are once pledged and the obligation issued, the Legislature would possess the power, pending the unliquidated outstanding obligations, to repeal and devote the revenue to other purposes. State ex rel. Freeling v. Howard, 67 Okla. 296, 171 P. 41; In re Assessment First Nat. Bank of Chickasha, 58 Okla. 508, 160 P. 469; Runnells v. Oklahoma City, 150 Okla. 292, 1 P. (2d) 740; Perryman v. City Home Builders, 121 Okla. 150, 248 P. 605; Moore, Co. Treas., v. Otis, 275 Fed. 747; Fazende v. City of Houston, 34 Fed. 95; State ex rel. McKinley v. Cordozo, 8 S. C. 71; Willis et ux. v. Miller, Treas., 29 Fed. 238; State ex rel. Tipton v. Erickson (Mont.) 19 P. (2d) 227.

In the cited case this court quoted with approval the decision of California in Shelton v. City of Los Angeles, 206 Cal. 544, 275 P. 421, and Garrett v. Swanton (Cal.) 13 P. (2d) 725, indulging the special fund doctrine. That case is to the effect that

the overwhelming weight of judicial opinion in this country is to the effect that bonds or other form of obligations issued by public agencies under legislative authority are to be sustained when the obligations are secured by and payable only from revenues to be realized from the particular property acquired with the proceeds of the obligations. Reliance was had upon the decisions in Butler v. City of Ashland (Ore.) 232 P. 655, and Schnell v. City of Rock Island, 232 Ill. 89, 83 N. E. 462, 14 L. R. A. (N. S.) 874.

Herein the revenues devoted to pay the obligations have traditionally, by legislative enactment, been devoted toward state highway construction. There are but limited exceptions. Herein such revenues, if not solely to be derived from use of the construction contemplated, at least are to be augmented thereby. It is not feasible to collect a direct toll for the use of the public roads, but the collection of these excise taxes substantially arrives at the same end. By use of the highway provided, the funds increase.

In State ex rel. Capitol Add. Building Commission v. Connelly (N. M.) 46 P. (2d) 1097, 100 A. L. R. 878, the question arose as to the validity of an act authorizing a bond issue pledging certain excise taxes for the payment thereof without a levy of an annual property tax for such purpose, and without submitting the question to a vote of the people. The provisions of the New Mexico Constitution are similar to ours. The requirement there is that the law authorizing the debt must provide for an annual tax levy sufficient to pay, etc. Our Constitution requires a direct annual tax. In that case the special fund provided was not the income or revenue derived from rentals, etc., of the public building, or utility to be constructed from the proceeds of the sale of the bonds, but a special tax in the nature of an excise tax levied or charged upon the filing of each civil action filed in the office of the clerks of the various district courts of the state. The main question there, as here, was whether the debentures in question, when issued, would constitute a general obligation of the state. Therein it was said:

"In considering the question before us, we are not unmindful of a cardinal rule of construction applicable when dealing with state Constitutions, as distinguished from the federal Constitution. 'The Constitution of the United States is a grant of power, and the various departments of the federal government possess only those powers which are expressly or impliedly conferred on

them by the Constitution.' 12 C. J. 743, sec. 157. But, 'the Constitutions of the several states, unlike the federal Constitution, are not grants of power. On the contrary, they are limitations on the legislative powers of the states. * * * But however definitely the powers to be exercised under a state Constitution may be pointed out, the legislative powers of the states are very general and very indefinite, notwithstanding; and the generally accepted doctrine is that they may pass any acts that are not expressly, or by necessary implication, inhibited by their own Constitutions or by the federal Constitution.' 12 C. J. 745, sec. 167.

"The debt limitation provisions of our state Constitution are just what the term implies, 'limitations,' and not grants of power. If the latter, it might with force and precedent be contended that a grant of power to create an indebtedness of a certain kind or in a certain manner was a denial of power to create a debt of any other kind or in any other manner. This under the doctrine of expressio unius est exclusio alterius. State v. Board of County Com'rs, 4 Neb. 537, 19 Am. Rep. 641."

It was further said:

"So, too is the power of the Legislature plenary in the matter of incurring indebtedness, except as limited by the Constitution. 59 C. J. 213, sec. 350, under topic, 'States.' And no more in the one case than in the other may the courts convert into a grant that which concededly is a limitation, and thus deny to a co-ordinate branch of the government the exercise of a power not withheld from it by the framers of our fundamental law.

"Now, either the debentures here assailed are to be condemned because not repayable from the proceeds of a property tax levy, or they are not within the interdiction of article 9, sec. 8, because not the kind of debt therein contemplated. One or the other conclusions seems inescapable. The framers of the Constitution were not unacquainted with excise taxation as a source of revenue, as witness the language of art. 8, sec. 2, as originally adopted. They thus either purposely denied to the state, through its Legislature, the power to employ same as a basis of credit to any extent whatsoever, and deliberately imposed the whole burden of repaying such indebtedness as lawfully might be created upon property taxpayers; or they left the Legislature in possession of its plenary powers touching the subject.

"It is not unusual to find words employed in a Constitution in a less comprehensive sense than they are capable of bearing. 'Taxes' is surely a term broad enough to cover excise as well as property taxes. And yet we have held in accordance with the courts of other states that the word 'taxes,' as used in the constitutional guaranty of equality and uniformity does not apply to excise taxes. State v. Mirabal, 33 N. M. 553, 273 P. 928. Construing together these companion sections of article 9, in order to arrive at the true meaning and intent of the framers of the Constitution (Cutierrez v. Middle Rio Grande Conservancy District, 34 N. M. 346, 282 P. 1, 70 A. L. R. 1261), we hold the debt contemplated in section 8 thereof is one secured by a property tax, and not an excise tax.

"And so we conclude that the debentures in question, neither requiring nor warranting a resort to the general taxing power of the state for their retirement, but payable instead from proceeds of an imposition in the nature of an excise * * * will not constitute a general obligation on the part of the state. Hence they are not within the interdiction of art. 9, sec. 8, of the state Constitution."

The decision in the above case is well fortified by authorities from other states to the same general effect. They are Moses v. Meier, 148 Ore. 185, 35 P. (2d) 981; Ajax v. Gregory, 177 Wash. 465, 32 P. (2d) 560; Briggs v. Greenville Co., 137 S. C. 288, 135 S. E. 153; State v. Moorer, 152 S. C. 455, 150 S. E. 269; State v. Stevens, 173 S. C. 149, 175 S. E. 213; State v. Kansas State Highway Commission, 138 Kan. 913, 28 P. (2d) 770; Alabama St. Bridge Corp. v. Smith, 217 Ala. 311, 116 So. 695.

The opinion quotes extensively from said decisions. We deem it unnecessary to repeat the quotations here. Suffice it to say that the cases fully sustain the ruling in the New Mexico case.

The Kansas case, supra, is assailed upon the ground that it is based upon a constitutional amendment. But the amendment mentioned was not to the section of the Constitution limiting state indebtedness. It was an amendment whereby a prohibition against the state engaging in carrying on or engaging in internal improvements was eliminated to the extent that the state might adopt, construct, reconstruct, and maintain a state system of highways with the provision, "But no general property tax shall ever be laid nor bonds issued by the state for such highways." (Art. 11, sec. 8, now sec. 9.) And the state was given the power "to levy special taxes for road and highway purposes on motor vehicles and motor fuels." (Art. 11, sec. 9, now sec. 10.)

Prior to said amendments the state of Kansas, as such, could not engage in the building of a state highway system nor could it levy special or excise taxes to be devoted to that purpose.

It may be observed that our Constitution, sec. 1, art. 16, specifically authorizes and directs the Legislature to establish a Department of Highways, and the power is granted to create improvement districts, and provide for building and maintaining public roads. Then in that respect the Legislature of Oklahoma has, since the adoption of the Constitution, had the power which the amendment to the Constitution of Kansas, adopted in 1928, gave to the Legislature of the state of Kansas, or rather removed a restriction from the Constitution which prohibited the exercise of such power. Furthermore it has long been held that the Legislature of this state had the power to levy excise taxes and the gasoline and license or registration fees on motor vehicles and devote the same exclusively or in part to the construction and maintenance of state highways. The only difference between the law of the state of Kansas and that of Oklahoma is that in Kansas the excise tax referred to must, by constitutional provision, be devoted to road and highway purposes exclusively, while in this state the power is given by the Constitution to levy and collect such taxes and fees, but it is left to the discretion of the Legislature to determine what disposition shall be made of the money so provided.

Section 36, art. 5, of the Constitution provides:

"The authority of the Legislature shall extend to all rightful subjects of legislation, and any specific grant of authority in this Constitution, upon any subject whatsoever, shall not work a restriction. limitation, or exclusion of such authority upon the same or any other subject or subjects whatsoever."

Thereunder, the Legislature has, for the most part, devoted that part of the excise tax on gasoline, and that part of the motor vehicle and license taxes or fees, apportioned to the state to state highway purposes. Its power so to do has never been questioned. In the act in question the Legislature has merely provided for the pledge of 40 per cent. of its share of the gasoline tax, and under certain circumstances, a possible pledge of a part of its share of the motor license and registration fees, to the payment of the notes in question. And that in effect by legislative act effectively devotes that portion of the tax to highway purposes. This may be done as effectively under legislative act, while the act is in force, as by the Constitution. Therefore, the authority under which the warrant issued in the Kansas case was sustained is no greater than that which the Legislature has always had under our Constitution.

The majority opinion recited that section 9, art. 10, Constitution, before the amendment thereto August 15, 1933, authorized an ad valorem tax for state purposes not to exceed 3½ mills, but that the amendment provided that "no ad valorem tax shall be levied for state purposes * * *"; "that the state is now wholly dependent upon funds derived from levies of specific taxes for the operation of the affairs of government."

It is difficult to understand how these statements can be made in view of our holding in Adams v. City of Hobart, 166 Okla. 267, 27 P. (2d) 595. It is true that ad valorem taxes for current expense purposes of state government were abolished by the amendment, but the amendment as adopted contained the provision as before, "except as herein otherwise provided." It is obvious and adjudicated by this court that the exception clause left intact such constitutional provision for governmental debt as provided by sections 23, 24, 25, and specifically 27, of art. 10. Section 25, id., requires a direct annual tax to pay "and sufficient to pay" such a state debt. Such an annual tax in the cited case was an ad valorem tax, and it was sustained in addition to the limitation provided by the amendment. Thus for a capital investment the amendment to section 9, art. 10, Constitution, has no function to perform, and a contrary view nullifies provisions of section 25, id.

Under the authorities above cited, I conclude that the notes in question, when and if sold, not requiring the levy of a direct annual ad valorem tax for their retirement, but payable entirely from proceeds of an excise or special tax, will not become a general obligation on the part of the state, within the provisions of sections 23, or 25, of art. 10 of the Constitution.

In 1929, the Supreme Court of Iowa had before it a case involving the procedure adopted for the incurring of a state debt which was to be repaid by a direct annual tax and also from a fund arising from gasoline and motor vehicle licenses. See State ex rel. Fletcher v. Executive Council, 207 Iowa, 923, 223 N. W. 737. The court held:

"The General Assembly has no power to pledge or to substitute indirect taxes for the direct tax required by the Constitution for the payment and discharge of a state bonded indebtedness approved by the people under section 5, art. VII."

Thus it is seen that, under section 25,

art. 10, Constitution, should we follow the decision of Iowa, an affirmative vote of the people on the present proposal would not satisfy a debt incurred under the exception provided by the constitutional provision, supra, but that this is the character of obligation not inhibited by the constitutional limitation, but a new species of obligation arising under exercised legislative plenary power.

The annotation contained in 100 A. L. R. 901, supports the view herein expressed:

"Although the cases are not entirely in accord and dissenting opinions have been frequent, it has generally been held that an obligation payable exclusively from a special fund created by the imposition of fees, penalties, or excise taxes, and for the payment of which the general credit of the state or municipality is not pledged and resort may not be had to property taxation, is not a debt within the meaning of the constitutional debt limitations. Differences in constitutional and statutory provisions to some extent account for the differences in reasoning and results of the various cases.

"Thus, in Ajax v. Gregory (1934) 177 Wash. 465, 32 P. (2d) 560, the issuance and sale by the state liquor control board of bonds payable only from a 'liquor revolving fund,' consisting of license fees, permit fees, penalties, forfeitures, and other money received under the State Liquor Act, which provided that each bond and interest coupon should show on its face that it was payable solely from such fund and not otherwise, and that neither the state nor the board nor any member thereof should incur any liability by reason of such bonds, was held not to create an indebtedness of the state within a constitutional debt limitation.

"Following the Ajax Case (Wash.) in Moses v. Meier (1934) 148 Ore. 185, 35 P. (2d) 981, it was held that a constitutional provision that the legislative assembly should not 'in any manner create any debt or liabilities which shall singly or in the aggregate with previous debts or liabilities exceed the sum of $50,000' was not violated by the issuance of certificates of indebtedness payable solely from the 'state unemployment relief fund', which consisted of revenues derived 'from the manufacture, sale, distribution, taxing, or licensing of liquor.' The court said: 'From the above statutory provisions it is clear that these certificates of indebtedness drawn on a special fund and to be paid solely from 'anticipated revenue derived from the manufacture and sale of alcoholic beverages are not general obligations of the state. In the event the anticipated profits do not materialize and the fund becomes exhausted, the purchaser of such certificates has no legal redress against the state. He must look solely to the fund upon which they are drawn. Whether there would be a moral obligation to redeem such certificates of indebtedness is a matter with which this court is not concerned. Suffice it to say there is no legal obligation to do so in the event the special fund is exhausted. * * *' In the event the net revenues turned into the relief fund are insufficient to redeem the certificates of indebtedness, there will be no additional tax burden by reason thereof, for, as previously stated, there is no general obligation on the part of the state to redeem them. A 'debt' within the meaning and purview of the constitutional provision in question is that which the state in any event is bound to pay.

"So, in State ex rel. Boynton v. Kansas State Highway Commission (1934) 138 Kan. 913, 28 P. (2d) 770, a statute authorizing the State Highway Commission to borrow money from an agency of the federal government for highway purposes, and to issue therefor warrants payable solely from a fund created by a special tax on motor vehicles and motor fuel, was held not unconstitutional as creating an indebtedness within the meaning of constitutional provisions making debts in excess of $1,000,000, void unless submitted to and ratified by a vote of the people. The court said: 'The debts referred to in (the Constitution) are debts to be paid by general property tax. This is clear from the reading of the sections. What the framers of our Constitution were guarding against was the incurring of debts in excess of a million dollars payable by a general property tax without the question having beeen submitted to and adopted by the people. They regarded property as the basis of taxation. * * * They were not dealing with the question of obligations to be paid only by special tax, such as on motor vehicles or motor fuels, or from funds raised in some manner other than by a general property tax.'

"And in Briggs v. Greenville County (1926) 137 S. C. 288, 135 S. E. 153, where the state agreed to repay moneys advanced by counties and highway districts for road construction, from a special fund consisting of the proceeds of the automobile license tax, three-fifths of the gasoline tax, and federal aid moneys, it was held that such agreements did not constitute debts within the meaning of a constitutional provision requiring their submission to a popular vote. The court said: 'The proposed reimbursement agreements will not constitute a general liability of the state. The reimbursements to be made thereunder can be made only from a special fund consisting of the gasoline tax, automobile license tax, and federal aid. No property tax can ever be levied to meet these obligations. Is such a limited liability a debt of the state in the

constitutional sense? The underlying purpose of the constitutional provisions concerning the creation of state debt was that they should serve as a limit of taxation—as a protection to taxpayers, and especially those whose property might be subject to taxation. This purpose will not be defeated if it should be held by this court that a debt for the construction of a state highway system, payable exclusively from federal aid moneys and special license taxes to be borne by the persons who will derive the principal benefits from the state highway system, is not a debt of the kind required by the Constitution to be approved by the voters of the state before it is incurred. According to the weight of authority in other states, such a debt does not fall within the terms of such a constitutional provision.'

"The court quoted from Briggs v. Greenville County (S. C.) supra, in California Toll Bridge Authority v. Kelly (1933) 218 Cal. 7, 21 P. (2d) 425, where the special fund consisted of the proceeds of gasoline tax. Holding that the statute in question contemplated a present appropriation of existing funds for building approaches to and operating and insuring bridges, and for that reason did not create a debt within the constitutional limitation, the California court said: 'Under the authorities from other states, however, even if the statutes had purported to pledge these funds for these purposes, such action would not constitute the pledging of the credit of the state. These funds are special funds, and obligations payable solely from such funds do not constitute a debt within the meaning of the constitutional limitation involved.' "

"In Alabama State Bridge Corp. v. Smith (1928) 217 Ala. 311, 116 So. 695, holding the issuance of bonds by the state bridge corporation, under a statute pledging for their payment, the surplus from gasoline tax collections, as well as the right to collect toll from bridges constructed, not violative of the constitutional provision that 'no new debt shall be created against or incurred by this state,' the court said: 'Debt', within the meaning, the purview, the whole content, of the constitutional provision, is that which the state in any event is bound to pay, an obligation secured by the general faith and credit of the state.' It pointed out that in the present case 'there is no promise on the part of the state to pay in any event; there is no pledge that there will be a surplus of any fund; there is no pledge of the general credit of the state; there will be no debt within the meaning' of the Constitution.

"Again in Re Opinion of Justices (1935, Ala.) 163 So. 105, it was held that a proposed statute authorizing certain counties to issue obligations payable solely out of gasoline tax collected by the state and allocated to the counties, and expressly declaring that they were not to be a charge on the general credit of the counties, would not authorize the creation of debts of the counties within the constitutional limitation. * * *

"See, also, Laredo v. Frishmuth (1917, Tex. Civ. App.) 196 S. W. 190, where the court said: 'It is the rule, well sustained by authority, that contracts may be made without incurring a debt within the meaning of the Constitution—when the debt is made payable out of a special fund raised or to be raised.—The fact that such special fund is not in existence at the time when the bonds were issued does not make the expenditures incurred on the credit of the fund and only payable therefrom an indebtedness in the purview of the Constitution.' In that case the fund from which the obligations were to be paid consisted in part of the proceeds of a property tax, and in part of amounts derived from the sale of municipal lands, from buildings erected with the borrowed money, and in fines and forfeitures collected by the city."

I conclude that the matters covered by the act come within the subjects of rightful legislation and that the act in no sense violates any provision of the Constitution.

The writ sued for should be denied.

WELCH, J. (dissenting). I dissent from the majority opinion. I concur in the dissenting opinion of Mr. Justice Riley, and in addition thereto, desire to make this statement.

I think the matters in controversy here more exactly relate to the state policy or the "public policy" of the state, as that expression is customarily used. That is, I think the method to be followed in selecting and prosecuting a chosen highway construction program is a question of "public policy" of the state.

Our Constitution, in section 1, article 16, in effect, directs the Legislature to establish a department of highways and to provide for building and maintaining roads and highways throughout the state. In compliance therewith our Legislature has directed the various methods and plans followed since statehood. We have had a varying policy as to the personnel and organization of our State Highway Commission, and have tried various methods and plans of highway construction, all by appropriate legislative acts. Various legislative enactments have specifically created a highway construction fund or highway construction and maintenance fund, as illustrated by sections 8 and 18, chapter 48, S. L. 1923-24, section 1, article 3, chapter 50, S. L. 1935, and

article 3, chapter 50, S. L. 1937. It has always been the public policy of the state to comply with that constitutional provision, but various changes in the policy have been made from time to time by the Legislature as to the method of compliance.

It is apparent to me that the last Legislature had before it these two propositions, that is, whether the state should continue to build highways and bridges only as moneys accrued in this fund, or whether it would be a progressive step and the better plan to start a more comprehensive program by anticipating accruals to the fund, and obtaining moneys for present construction work by issuing these notes to be paid in future years from a portion of such accruals.

Several other states had chosen the latter method for construction work and for other governmental programs, and the respective courts of those states had upheld such action, as shown by citations in the majority opinion and in the dissenting opinion of Mr. Justice Riley. Our Legislature then chose this method as the best method for our state, and all portions of our state. While this may be called a sharp change in policy, in my judgment it is not for this court to say that the program may not go forward on this changed plan and policy.

It is universally held that the "public policy" of the state is fixed by the Legislature of the state upon subjects concerning which the Legislature has spoken by its enactments; as is well illustrated by expressions in Mahaffay v. Smith (Mont.) 254 P. 875, and Kruse v. Fischl (Mont.) 175 P. 878.

Practically every state Constitution contains provisions similar to our own as to the objections here raised to this legislative enactment. As shown by the majority opinion, several of those states preceded Oklahoma in this broadened public policy of progressive construction work with funds obtained by the advanced anticipation of accruals, known with reasonable certainty to be collectible into the special construction fund in the future. Nor is this the first time that our state has proceeded by act of the Legislature, without a public election or vote of the people on the subject, to anticipate specific revenues, and thereby obtain funds for present construction work. Several times our state has prosecuted its building program for educational purposes by this method. One such project was tested and approved by this court in Baker v. Carter, 165 Okla. 116, 25 P. (2d) 747.

I think it is a matter for legislative consideration and determination whether this more broadened policy should be extended to include a comprehensive road building program. It may be questionable whether this policy is better; so as to the educational construction work, the policy may have been questionable; but any such questions are for the legislative branch of state government, in my judgment. The exact plan as applied to a road building program is not novel and untried, for it has been tried and judicially approved in other states, and the general plan of present construction work with money from anticipation of future accruals has been tried and judicially approved in our own state.

This court, in my judgment, might well follow our own former decision, and the studied opinions of other states, and now refuse to interfere with this legislative policy and plan by which, without any tax increase, these present funds are obtained by anticipation in a manner deemed reasonable and proper by the Legislature, for statewide use in present highway construction. And it is for these reasons that I dissent to the majority opinion holding the act in question one prohibited by the Constitution.

HOLT, Special Justice (dissenting). I dissent from the majority opinion and concur in the dissenting opinion of Justices Riley and Welch. That the "notes" in question would be "debts," is beyond question; but I cannot bring myself to believe they are "debts" such as are limited by constitutional provisions. On July 16, 1907, the date of adjournment of the Constitutional Convention, there wasn't a parking lot full of automobiles in Oklahoma; and the most visionary member of this convention never dreamed of building a widespread system of paved roads over the state by an excise tax on gasoline. When they wrote the debt-limit clause of the Constitution, they could have meant but one thing—a debt payable by a general property tax. This court recently held in City of Ardmore v. State ex rel. Oklahoma Tax Commission, 168 Okla. 316, 32 P. (2d) 728, that the excise tax on gasoline is not a property tax.

I think this court, in the recent case of Baker v. Carter, 165 Okla. 116, 25 P. (2d) 747, has committed itself to an approval of the "special fund doctrine" by approving the act of the Legislature providing for the issuance of $450,000 of dormitory bonds for the A. & M. College. The majority opinion, in the case at bar, quotes with approval the

famous 85-year-old-canal-bond case of Newell v. People,. 7 N. Y. 9, wherein was involved the validity of a large amount of canal bonds that were payable from revenues such as tolls, charges, etc., to be derived from the canals. The Court of Appeals of the State of New York held that such bonds were obligations of the state and as such exceeded the debt limit of the Constitution, and therefore void; yet this Newell Case is not followed in the case of Baker v. Carter, supra, for in the latter case, this court upheld,—and correctly so, in my opinion, the validity of these dormitory bonds that are payable out of rents, fees, and charges paid by students for the use of said dormitories. In this case this court held:

"The bonds are not debts of the state because the Legislature did not obligate the state to levy direct taxes each year to pay the principal and interest of the bonds."

I think that is the correct statement of the law, and one that should be announced in the present road note case.

While not an issue in this case, this court must take judicial notice that, in 1935, the Legislature passed, within a few days of each other, various acts providing for the issuance of dormitory bonds for various state schools, aggregating $1,850,000, all the bonds payable out of a special fund created from rents, fees, and charges paid by students of the several colleges, for the use of the dormitories. None of these bonds were submitted to a vote of the people. Following, no doubt, the decision in the Baker v. Carter Case, supra, these bonds have never been questioned. These dormitories are state property. The highways of the state are state property. The question naturally arises, which is the most important, the dormitories to house the students, or the highways over which they must travel to reach them?

That the Legislature has a right to set aside the rents, fees, and charges derived from the state-owned dormitories, into a separate and distinct fund, with which to pay the dormitory bonds, is not even debatable. That it likewise has authority to set aside into a "special fund" a portion of the gasoline excise tax, which was basically levied for the purpose of building roads (see section 8, chap. 239, S. L. 1923), for the purpose of paying the principal and interest of the proposed road notes, as they mature, likewise should not be questioned. This it has done in the act under consideration; and the act, having otherwise the attributes of a valid and binding statute, I think it should be upheld.

While there is a respectable array of authorities, as cited by the majority opinion, that support the conclusions reached therein, yet there is an equal line of sound authorities, exclusive of the Baker v. Carter Case, in support of the "special fund doctrine" and the validity of the act under consideration. Most of these cases are cited in the dissenting opinion by Justices Riley and Welch. In fact, I think the weight of sound reasoning is in support of the act; and the Legislature having expressed the apparent will of the people by passing the act, I think this court should uphold it, following the well-established rule:

"Where there is sufficient uncertainty concerning the meaning of a legislative enactment to render two different constructions possible, one conforming to the requirements of the Constitution, the other rendering the act unconstitutional or creating grave doubts concerning its validity, the construction rendering the act valid will be adopted by the courts." Union Indemnity Co. v. Saling et al., 166 Okla. 133, 26 P. (2d) 217.

One could infer from the oral argument of counsel for plaintiffs and from their written brief that the Legislature is a body antagonistic to the people. But, on the contrary, the Legislature is the chosen representative of the people. It speaks for the people. It, and it alone, passes laws and repeals laws for the people. This is all summed up admirably in the famous Reeder Case, 171 Pa. 513, 33 L. R. A. 141, where the Supreme Court of Pennsylvania says:

"* * * Whatever the people have not, by their Constitution, restrained themselves from doing, they, through their representatives in the Legislature, may do. This latter body represents their will just as completely as a constitutional convention in all matters left open by the written Constitution. Certain grants of power, very specifically set forth, were made by the states to the United States, and these cannot be revoked or disregarded by state legislation; then come the specific restraints imposed by our own Constitution upon our own Legislature. These must be respected. But in that wide domain not included in either of these boundaries, the right of the people, through the Legislature, to enact such laws as they choose, is absolute. Of the use the people may make of this unrestrained power, it is not the business of the courts to inquire. We peruse the expressions of their will in the statute, then examine the Constitution and ascertain if this instrument says, 'Thou shalt not,' and if we find no inhibition, then the statute is the law, simply because it is the will of the people, and not because it is wise or unwise."

For the reasons set out herein and in the dissenting opinion of Justices Riley and Welch, the writ should be denied.